STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN LOUIS VASZORICH AND GEORGE LOUIS CHRISTIAN BROWN, DEFENDANTS-APPELLANTS.

Argued June 1, 1953—Decided June 22, 1953.

100

*Mr. Edward F. Juska* argued the cause for appellant Vaszorich.

*Mr. William J. O'Hagan* argued the cause for appellant Brown (*Messrs. Stout and O'Hagan,* attorneys).

*Mr. George A. Gray,* Assistant Prosecutor, Monmouth County, argued the cause for respondent (*Mr. J. Victor Carton,* Monmouth County Prosecutor, attorney; *Mr. Gray* on the brief).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. Appellants Vaszorich and Brown, and one Berry who does not appeal, were convicted in the Monmouth County Court upon an indictment for the murder on September 8, 1951 of Jeremiah Delhagen. Vaszorich was sentenced to death, and Brown and Berry, upon the jury's recommendation, to life imprisonment. Vaszorich was 19 years of age and both Brown and Berry were 17 when the crime was committed.

The decedent, aged 60, lived alone in a four-room bungalow at Wayside. In the late evening of September 8, 1951 he was asleep in a chair in his living room when the three youths, in accordance with a plan made some days earlier to burglarize the house and rob Delhagen, entered a bedroom adjoining the living room through a window opening upon the front porch. Before going into the house Vaszorich obtained Mr.

Delhagen's steelworker's claw wrench, some 17 inches long, from the cellar. Vaszorich went almost immediately to the living room where he brutally beat the sleeping man about the head numerous times with the heavy wrench. When decedent, awake and begging not to be hit, struggled to rise, Brown and Berry came to Vaszorich's aid and helped subdue him until Vaszorich succeeded in binding him with some strings of Christmas tree lights which Berry found in one of the bedrooms. Pillows and some furniture were also piled on him. Meanwhile Berry and Brown had stripped the decedent of his trousers, and Vaszorich took from his pocket a wallet containing approximately $300. The search of the house for other valuables was continued and a wrist watch and gun were taken. The decedent continued to struggle to get up, whereupon Vaszorich dragged him into the kitchen and beat him again about the head with the wrench and piled furniture, blankets and pillows and other things upon him, after which he joined Brown and Berry at the front of the house, threw the wrench in the front yard and the three left. They drove away in an automobile they had parked nearby. The car was owned by one John Dean or Dino with whom Brown lived and who allowed Brown the use of it. En route to Shark River Hills Vaszorich gave Brown and Berry each one-third of the stolen money and threw the wallet, the gun and the wrist watch out of the car window at different places on the way. Vaszorich's shirt became considerably bloodied during the assault upon Mr. Delhagen, and when they reached Shark River Hills he attempted to burn his shirt, but unsuccessfully; after the three confessed the shirt was recovered by the authorities. Brown and Berry also had blood stains on their clothing. The three went to a diner in Belmar where they washed up in a washroom and then sat down to a meal of pie, coffee and sandwiches.

In the meantime Mr. Delhagen managed in some way to get to the home of a neighbor who summoned the police. He was immediately taken to Fitkin Memorial Hospital but did not respond to treatment and died in the early morning of September 10. Later that same morning an autopsy was

performed. This disclosed that the blows with the wrench caused a skull fracture and intercranial hemorrhages. There were 14 lacerations on his head and four others distributed on the left shoulder, arm and wrist and hand.

Appellants argue a number of points, some applicable to both and others to only one of them. The points will be considered under appropriate topic headings.

## THE CONFESSIONS

Vaszorich alleges error in the admission of his confession into evidence. He contends that the proofs show that it was not voluntarily given in matter of law, that from the time of his arrest early on October 1 until the confession was signed on October 4 "he was questioned for hours on end every day by waves of inquisitors; was taken in and out of cells; was moved around to various police headquarters throughout the county and to the jail at Freehold; was taken out by detectives to look for various items allegedly used in connection with the crime; was taken to a State psychiatrist; was given very little food at irregular hours and in general, every psychological trick and pressure was applied by police authorities of various municipalities, by detectives attached to the Prosecutor's office and by the Assistant Prosecutor himself." The argument concludes, "It cannot be said on the bare record itself that a statement given by a nineteen year old boy after hours and days of questioning, illegal detention, irregular meals, shifting from one police station to another and faced at all times by groups of questioning authorities, can possibly be voluntary."

This proposition that Vaszorich was the helpless victim of a relentless and reprehensible "suction" process is without support even in his own testimony. The governing principles upon this question have been discussed in several of our recent opinions and no purpose would be served in stating them again. See *State v. Cooper*, 2 *N. J.* 540 (1949); *State v. Bunk*, 4 *N. J.* 461 (1950), *cert.* den. 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950); *State v. Pierce*, 4 *N. J*

252 (1950); *State v. Cooper*, 10 *N. J.* 532 (1952); *State v. Grillo*, 11 *N. J.* 173 (1952), *cert.* den. —— *U. S.* ——, 73 *S. Ct.* 1123 (1953). The essence of the inquiry is whether in obtaining the confession there was observance of "that fundamental fairness essential to the very concept of justice," for "the aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether. true or false." *Lisenba v. People of the State of California*, 314 *U. S.* 219, 236, 62 *S. Ct.* 280, 290, 86 *L. Ed.* 166, 180 (1941). And "Whether a statement or confession is, in fact, voluntary, depends on the facts of the individual case and the determination of the trial court will not be disturbed on appeal where the evidence is adequate to sustain it." *State v. Cooper, supra*, 10 *N. J.*, at 550. Here Vaszorich admitted that after his arrest on October 1 at his mother's home in Ocean Grove he was first taken to the local police station and there turned over to the Deal police who took him to the Deal police station where he stayed until the next morning; that during the morning of October 1 he was questioned about matters other than the Delhagen case but not at all in the afternoon or early evening about anything except that he was interviewed by some reporters; that he was first questioned about the Delhagen murder starting at about a quarter before eleven that night and continuing, according to him, until 1:30 in the morning of October 2, after which he was not disturbed until 7:30 that morning when county authorities took him into custody and he was arraigned before a magistrate upon the charge of murder; that following that appearance he was taken to the jail at Freehold, the county seat, and from there to some place, with Berry, on an investigation not connected with the Delhagen case, and for a time during the afternoon was with the Director of the State Hospital at Marlboro, a psychiatrist, returning to the jail about 7:30 that evening, after which he was not disturbed through the night; that throughout the day, October 2, little was said to him by the authorities about the Delhagen murder; that on October 3 he was not interrogated

about the case except as officers mentioned it to him incidentally while "walking through the woods"; that on October 4 he was brought to the prosecutor's office at about 2:30 P. M. to be questioned about the Delhagen murder and that in the course of the afternoon he gave his statement, signed it and initialled the several pages. Plainly, we need not refer to the other abundant proofs supporting the finding of the trial judge in order to demonstrate that Vaszorich's contention is wholly without substance. *Cf. State v. Grillo, supra.* "Psychological coercion" in any sense recognized in the law was not proved. See *Stein v. People of the State of New York,* 73 *S. Ct.* 1077 (1953).

Brown's contention is that the trial judge erred in not instructing the jury, as Brown requested, that "whether the statement of Brown was voluntarily made or not is a question to be decided by you," and in charging instead: "Where there is a dispute as to the voluntary character of a statement or confession made by a defendant, the trial court must pass upon the quality of the confession. This Court after receipt of the testimony for and against the voluntary character of the statements made by these three defendants has admitted them into evidence. The confessions are now part and parcel of all the evidence in this case, and it is left for the jury to decide whether the defendants spoke the truth when they confessed. In other words, the jurors within their province can weigh them, accept them or reject them, as you choose."

██ We do not see that the trial judge entirely withdrew the question of the voluntariness of Brown's confession from the jury, particularly when considered with the fact that the judge charged Brown's request number 10 which was: "If you find that the statement taken from the defendant George Eugene Christian Brown was not voluntarily made by him, I charge you that the requirement of the law is not to exclude from consideration evidence which is presumptively false, but to prevent unfairness in the use of evidence whether true or false." But, even accepting Brown's view of the effect of the charge given, it is settled in this State that since the determination whether or not a confession is volun-

tary governs its competency to be received in evidence, the factual determination whether it is voluntary should in the first instance be made by the court consistent with the principle that matters of the competency of evidence are exclusively for the court to decide. It was, therefore, not error upon the receipt of the confession in evidence to leave to the jury only the question of the credibility of the confession, to believe, or not, the facts set out therein. *State v. Cole*, 136 *N. J. L.* 606 (*E. & A.* 1948), *cert.* den. 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773, 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782 (1948); *State v. Foulds*, 127 *N. J. L.* 336 (*E. & A.* 1941).

We observe in passing that the finding of the trial judge that Brown's confession was voluntarily given is fully sustained by Brown's own testimony. He was arrested in the early morning of October 1 at the home in Asbury Park of John Dean or Dino, with whom he lived. He was detained during the morning at the Asbury Park police headquarters and questioned about matters other than the Delhagen murder. He was then taken to Deal police station. He was first questioned about the Delhagen murder that night and within an hour confessed to his part. He was not disturbed during the night and admits that the following morning when shown his completed statement he read and signed it and initialled each page in the presence of a press photographer. It is admitted on his brief that he was taken before a magistrate shortly afterwards during the same morning and arraigned on the murder charge.

Nor do we perceive any merit in the argument on his brief that he was entitled by the provisions of the Juvenile and Domestic Relations Court Act, *R. S.* 9:18–12 *et seq.* (superseded by *N. J. S.* 2A:4–14 *et seq.*), to be processed in the Juvenile Court under the procedures applicable under that law to juveniles between the ages of 16 and 18. He concedes that that court was without jurisdiction to try him upon an indictment for murder. *In re Mei*, 122 *N. J. Eq.* 125 (*E. & A.* 1937). And the amendment of *R. S.* 9:18–12 by *L.* 1948, *c.* 284, *p.* 1191, expressly authorized the referral

of any case involving a minor between the ages of 16 and 18 "charged with an offense of a heinous nature" "to the prosecutor of the pleas of the county wherein the court is situate" to "be dealt with in exactly the same manner as any other criminal case involving an adult offender." An order of referral in compliance with the statute was duly entered on October 3 and was received in evidence.

Brown also alleges error by the trial judge in sustaining the State's objection to a hypothetical question asked a psychiatrist who testified for Brown that he was a psychopathic personality susceptible to suggestion. The question, it is said on Brown's brief, sought to elicit the opinion of the expert witness whether in making the confession "he was impelled to do so" by the alleged suggestions of the police officers "that it would be better for him" if he did. It is not made clear on the brief just how, if true, this would make the confession involuntary in the legal sense. However, the question was not phrased to produce the opinion whether in such case the confession was voluntary or involuntary. The witness was asked to state his opinion "whether or not George Brown, having the characteristics and the mental capacity to which you have testified and which are incorporated in my question, would be able to resist the suggestions made that it would be better for him to make a statement." Counsel insisted in the course of the argument on the State's objection that this was tantamount to asking whether the witness had an opinion whether Brown's "statement [was] due to a voluntary act, or was it due to a suggestion that was made to him by someone?" The trial court did not agree, but offered counsel the opportunity to rephrase the question in that form, saying "Why don't you ask him?" Counsel did not, but stated, "I shall rest on that, sir." The fact is that earlier the witness had responded that he could not answer yes or no when upon the same hypothesis he was asked, "Can you tell with reasonable certainty whether the statement so made and signed was the voluntary act of Gene Brown? Did it come of his own volition?" There was no error in the trial court's ruling in the circumstances.

### The Jurors' Instruction Manual

When the panel from which the jury was drawn reported for service each member was given a blue-covered pamphlet entitled "Primary Instructions to Jurors," endorsed "Compliments of" the Sheriff of Monmouth County. This was not the "Manual for Petit Jurors" prepared under the direction of this court and now the only manual of this type authorized for distribution in the courts of this State. The challenged pamphlet contains a number of wholly inaccurate or misleading statements of propositions of law among which is that which occasions the controversy here, namely, a completely erroneous definition of reasonable doubt under our law. There is also imprinted on the last page a quotation from Lycurgus as follows: "On the head of the criminal lies the crime; but in a miscarriage of justice the jurors delinquent become participants of guilt."

The discovery by the trial judge and counsel that the members of the panel were in possession of copies of the pamphlet was first made in the course of the *voir dire* examination of prospective jurors and at the time only 5 of the 14 jurors ultimately selected had been chosen. The selection of the jury required over two weeks from November 26 to December 10. The trial judge immediately upon the completion of the *voir dire* examination of the prospective juror during whose interrogation the fact became known promptly dealt with the problem as follows:

"The Court: May I see that blue book, please?

Mr. Juska: Yes, sir.

The Court: I don't know by whose authority this book entitled 'Primary Instructions to Jurors. Compliments of Morris J. Woodring, Sheriff, Monmouth County,' which booklet is supposed to contain primary instructions to jurors, was permitted to be given to the jurors. I don't know that any judge in this county has authorized the issuance of this book. At least I find nowheres contained therein such authorization.

I have not had the opportunity to examine it too carefully, but I can understand where it might be misleading when in the hands of laymen who know nothing about the law, and therefore I am going to instruct the Sheriff to pick up from each and every one of you who are serving on this panel of the jury the books in question, in-

cluding the five jurors who have already been sworn. It has been the practice in this State since the inception of the new Constitution to give the prospective jurors general instructions upon the opening of the session concerning their responsibilities and their duties in a general way, and then almost each individual judge practically repeats nearly the same instructions to you when you are sworn in a particular case.

In view of the fact that the law is given to you by the Court and under the system you must take the law from the Court and not from the Sheriff, I am asking that these booklets be picked up by Sheriff White now.

Mrs. Lewis: May they retain the list, your Honor?

The Court: Yes, they may retain the list.

That's all right as long as he doesn't have it here. One juror in the box. has his at home, but he won't be able to go home. So it won't do him any good.

Mr. Juska: May I be heard?

The Court: Yes.

Mr. Juska: The defense, sir, would like the record to show that pursuant to your Honor's instructions the jurors in the box Numbers 2, 3 and 4 returned to Sheriff White the books in question.

The Court: 2, 3 and 4. What happened to the other two? Where is yours?

Juror Number 1: Mine is home in my other bag.

The Court: Where do you have yours?

Juror Number 5: Mine is home in another suit.

The Court: It may be noted that all the books that are available except the two, Juror Number 1 and Juror Number 5, have been picked up.

Mr. Juska: May we now have a copy of the book marked into evidence?

The Court: What is the purpose of it?

Mr. Juska: Do you want it orally here or at the side bar so that it may not become part of the record?

(Counsel confer with the Court at the bench.)"

Vaszorich argues that it was error not to receive the pamphlet in evidence either at that time or a number of days later on December 17, the last day on which testimony was taken, when his counsel renewed. the offer of the pamphlet in evidence "as part of my case." We note that the record does not disclose that on either occasion the trial judge was informed of the purpose of the offer. We are told on the brief that it was "so that his (Vaszorich's) record might be made for review." It is also argued that it was error for the trial judge "not to declare a mistrial," although no motion for a

mistrial by any of defense counsel is shown by the record. In the circumstances both this court and the trial judge might well be justified in concluding that counsel did not view the situation as serious enough to call for the break-up of the trial and was content with the trial court's action in taking up the pamphlets and in instructing the jury that they were to take the law from the court. However, we shall deal with the contention made on the brief that Vaszorich is entitled to a reversal of his conviction on the ground that "this booklet is incorrect, inflammatory and highly prejudicial to the defendant."

Vaszorich relies on *Panko v. Flintkote Co.*, 7 *N. J.* 55 (1951), and *Palestroni v. Jacobs*, 10 *N. J. Super.* 266 (*App. Div.* 1950). Those cases lay down the principle that irregular matter having the tendency for improper influence "in a manner inconsistent with the legal proofs and the court's charge," *Panko v. Flintkote Co.*, 7 *N. J.*, at 61, which gets to the jury under circumstances which deprive the party adversely affected by it of the opportunity to rebut or counteract such influence, may be sufficient reason for nullification of the jury's verdict without further inquiry as to the actual effect of the irregular matter upon the jurors' minds. In each of those cases the jury verdict was annulled because the party affected had no such opportunity as the irregular matter reached the jury after the jury had retired and during their deliberations. But the principle of those decisions is not applicable here; the irregular matter came to light at a time when all parties and the trial court had a full and ample opportunity to take steps to avoid any improper influence of the manual upon the minds of the jurors and prospective jurors. The real question is whether in the circumstances of the case, with particular reference to the precautions taken by the trial judge, enough was done to dispel the tendency of the contents of the manual for improper influence. We think the prompt and firm action of the trial judge disclosed by the excerpt from the record above was sufficient in the circumstances. Apart from the fact that no motion for mistrial was made, even if one had been made and denied, it

is not generally necessary that a mistrial be declared. It will ordinarily suffice that the trial judge instruct the jury in definite and unexceptionable terms upon the right of the matter, which we think the trial judge did in this case, both at the time and later in his charge, when he instructed them that the jurors were to decide the case upon the evidence alone according to the law as he gave it to them. *Cf. State v. Bolles,* 13 *N. J. Misc.* 273 (*Sup. Ct.* 1935).

██ Counsel for Brown did not join in either proffer of the pamphlet in evidence made by counsel for Vaszorich, but argues error in the trial judge's refusal to make a requested charge, "I charge you that a reasonable doubt is a doubt existing for a reason, but a juror may have reasonable doubt, though unable to give good and sufficient reason for the doubt, or express it in words," informing us on the brief that the charge was requested to make certain that the jurors were not misled by the improper definition of reasonable doubt in the manual and particularly the sentence, obviously erroneous under our law, that "a reasonable doubt is one for which, should he be called upon, a juror can give a reason." The trial judge refused to charge the request upon the ground that the charge made upon the subject of reasonable doubt covered the submission. We agree that it did and find no error. The submission was fully embraced within that part of the charge which instructed the jury that reasonable doubt "refers to that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge. The evidence must establish the truth of the fact to a moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it." *Donnelly v. State,* 26 *N. J. L.* 601 (*E. & A.* 1857).

## The Night Trial Sessions

██ Both appellants assert prejudice allegedly resulting from the continuance of the trial sessions of December 10,

11 and 12 through the evening, after a dinner recess, until 9 o'clock. The trial judge ordered the evening sessions after securing the authorization of the Chief Justice as required by *Rule* A1. The basis of the asserted prejudice is stated on Brown's brief: "The placing of such a burden upon counsel is a denial of the constitutional guarantee of the right of representation by counsel."

The trial judge first announced his intention to have evening sessions on Friday, December 7, and no objection was interposed. Again, on Monday, December 10, after selection of the jury was completed and before the opening statements by counsel, the judge announced: "Incidentally, I am going to work until nine o'clock to-night, so guide yourselves accordingly." Again no objection was interposed. It was not until shortly before the close of the afternoon session on that day that all defense counsel requested a reconsideration, asserting "reasons of health" and "that the burden of a murder trial is sufficiently grave without sitting beyond reasonable hours." This was the extent of any objection made.

The gist of the contention is that counsel's representation of their clients' interests was not what it should be under the strain of evening sessions after the protracted period required to select the jury. We think that counsel show understandable but undue modesty. Both were assigned by the court to the defense of their respective clients. The record exhibits that they were unstinting in their efforts and unsparing of their energies and gave fully of their experience and ability in the protection of their clients' rights to a fair trial. They richly earned the commendation expressed by the trial judge at the conclusion of the trial. Their performance is another vindication of the policy of the bench and bar of this State which assures the indigent accused of proper representation on his day in court. We do not find the slightest evidence that the rights of Vaszorich or Brown in anywise suffered from any added strain upon their counsel incident to the night sessions.

### Rulings During Trial

Brown asserts error in the denial of his motion for a mistrial after the trial judge sustained his objection to a question asked Brown by the prosecutor during his cross-examination while testifying in his own defense. The question was, "How soon after the Delhagen job were you involved in another armed robbery?" Brown contends that he was entitled to a mistrial because the prosecutor by the question was attempting improperly to show that Brown had committed criminal acts for which he had not been convicted and which were not connected in any way with the indictment for murder on which he was being tried, and that the evidence did not fall within any exception to the rule making such testimony ordinarily inadmissible, citing *State v. DePaola*, 5 *N. J.* 1 (1950).

But Brown's testimony on his direct examination was that he had abandoned the common scheme of robbing Delhagen when he saw "all the blood and everything," and that he had become "nervous and sick" at the sight of Delhagen's blood. Immediately before the question at issue he had answered the prosecutor that the "shame" he felt during the robbery and murder was not alone for his part in what was happening to Delhagen but "for both" the robbery and the murder. The trial judge might thus well have viewed the question to be proper upon the authority of *State v. Barth*, 114 *N. J. L.* 112 (*E. & A.* 1935), where it was held that a defendant, on trial for murder committed in attempting a robbery, who testified that after the homicide he suffered from remorse, was properly cross-examined to show that within a month thereafter he was involved in five other robberies. In any event, after sustaining the objection and after extended argument upon the motion for mistrial, outside the presence of the jury, the trial judge summoned the jury back to the court room and stated: "I charge you now, as emphatically as I know how, to disregard that all together. It hasn't a thing to do with the trial of this case. The court has ruled in favor of the defendant Brown in connection

with that question. He need not answer it. So it is not evidence and you will disregard it." We think this instruction clearly sufficed in the circumstances.

Brown also alleges error in the overruling of his objections to two questions put to him, concerning his whereabouts the night before his arrest, upon his cross-examination while on the stand when the voluntariness of his confession was under consideration. The questions were: "Were you at Deal police headquarters?," to which Brown answered, "No, I was not," and "Were you in the custody of any police officers during that time, county detectives or any other enforcement authorities?," and again the answer was, "No, I was not." Brown argues that the questions contain a "harmful insinuation" prejudicial to his rights, despite his negative answers, that "Brown had been implicated in other crimes and that Brown prior to his arrest had been doing something for which he should have been in the Deal Police Headquarters." We think from our examination of the full context of the testimony in which the questions appear that the inference is most strained. In any event, the questions were clearly proper, as the trial court ruled, to test the credibility of Brown's claim on his direct examination that he had spent that night at home sleeping.

Vaszorich contends that he was prejudiced by the action of the trial judge in interrupting his counsel's opening to the jury to press counsel to state his defense. We have examined the colloquy at that point and perceive no impropriety of the trial judge in the circumstances.

## THE PROSECUTOR'S SUMMATION

Reversible error is urged by both appellants for alleged inflammatory and prejudicial statements outside the evidence by the prosecutor in the course of his summation.

We have recently had occasion to observe that comments by a prosecuting attorney upon matters not in evidence is highly improper and inconsistent with his obligation under Canon 5 of the Canons of Professional Ethics. *State v.*

*Bogen and Lieberman,* 13 *N. J.* 137 (1953). We also noted in that case, however, that every excursion outside the evidence will not necessarily vitiate a conviction and that on the question whether the improper comment shall have that effect, the making by trial counsel of a timely and proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations.

There are three excerpts from the prosecutor's summation to which objection is assigned, but from the record it appears that none was objected to when delivered and that objection was first interposed to each of them after the trial judge had permitted the jury to retire to their hotel for lunch with instructions to "return here at a quarter of two." The request on behalf of both defendants was that the jury be "asked to disregard" the remarks "and not to consider them" which, of course, would not be done in the jury's absence. The court accordingly stated that he would cover the subject in his charge. Upon the jury's return from the luncheon recess the court immediately began the charge. At the very outset he emphasized the function of the jury to decide the facts and to disregard anything about the facts which he might say if their recollection did not accord with his, and then stated: "That too, ladies and gentlemen of the jury, applies to statements made by any of the counsel. Arguments of counsel are not evidence."

In *State v. Bogen and Lieberman, supra,* we held that the improper remarks were not a basis for reversal in light of the facts there presented that some were not objected to, others were objected to and upon objection were withdrawn by the prosecutor, and where objected to, whether withdrawn or not, the trial judge instructed the jury to disregard them. Here under the circumstances that no objection was made until after the jury was excused so that the impropriety of the remarks could not have been dealt with by the judge, and perhaps withdrawn by the prosecutor, at a time when instructions to disregard them, if that was the court's view, might be given when of best effect, we cannot say that what was said in the charge in that regard was inadequate. The

summations were not evidence and the jury was properly told that their deliberations were to be had only upon the evidence. Our conclusion is strengthened by our careful consideration of the irregular comments in all of the circumstances of the case, from which we are convinced that the remarks, singly or in combination, are not such "plain errors affecting substantial rights of the defendant" that we should be moved to exercise our powers under *Rule* 1:2–19(*a*).

## THE VERDICTS

Appellants contend that the jury verdict against each was fatally defective under the principle expressed in *State v. Turco*, 98 *N. J. L.* 61 (*Sup. Ct.* 1922); *State v. Cooper*, 2 *N. J.* 540 (1949); *State v. Cleveland*, 6 *N. J.* 316 (1951), and *State v. Greely*, 11 *N. J.* 485 (1953).

The returns of the three verdicts, including that as to Berry, were as follows:

"The Clerk: Jurors, look upon the prisoner, Vaszorich. Ladies and gentlemen of the jury, have you agreed upon your verdict?

The Forelady: We have.

The Clerk: Who speaks for you, your forelady? Madam Forelady, do you find the defendant Vaszorich guilty in the manner and form as he stands charged in the indictment, or not?

The Forelady: We find the defendant, John Louis Vaszorich, guilty of first degree murder, with no recommendation.

The Court: The verdict as rendered by the forewoman may be recorded.

Mr. Juska: Will your Honor poll them now, or after you have heard them all?

The Court: Yes. As your individual names are called as to the defendant Vaszorich, will you be kind enough to render your own individual verdict? Your verdict has been recorded.

Forelady: That's right.

The Court: And you have stated it.

The Forelady: That's right.

The Court: Very well. Continue with the poll.

The Clerk: Gladys E. Kahle, how say you individually as to the defendant Vaszorich?

The Forelady: Guilty of first degree murder, with no recommendations.

The Clerk: Robert E. Hill, how say you individually with reference to the defendant Vaszorich?

Juror #2: Guilty of first degree murder, without recommendation.

The Clerk: Axel E. Palm, how say you individually with respect to the defendant Vaszorich?

Juror #3: Guilty of first degree murder, without recommendation.

The Clerk: Bessie L. McIntyre, how say you individually with reference to the defendant Vaszorich?

Juror #4: Guilty of murder, with no recommendation for mercy.

The Clerk: Jane P. Cottrell, how say you as to the defendant, Vaszorich?

Juror #5: Guilty of murder in the first degree, with no recommendation.

The Clerk: Clarence R. Martin, how say you individually with respect to the defendant Vaszorich?

Juror #6: Guilty of murder in the first degree with no recommendations.

The Clerk: Marjorie L. Keilt, how say you individually with reference to the defendant Vaszorich?

Juror #7: Guilty, with no recommendation.

The Clerk: May Gilmour, how say you individually with reference to the defendant Vaszorich?

Juror #8: Guilty in the first degree, without recommendation.

The Clerk: Thomas J. Callahan, how say you individually with reference to the defendant Vaszorich?

Juror #9: Guilty of first degree murder, no recommendation.

The Clerk: George F. Simpson, how say you individually with reference to the defendant Vaszorich?

Juror #10: Guilty of first degree murder, without recommendation.

The Clerk: Charles D. Greene, how say you individually with reference to the defendant Vaszorich?

Juror #11: Guilty, no recommendations.

The Clerk: John V. Hart, how say you individually with reference to the defendant Vaszorich?

Juror #12: Guilty of first degree murder, with no recommendations.

The Court: The verdict that has been rendered by each individual juror may be recorded.

The Clerk: Hearken to your verdict as the Court has ordered it recorded. You say you find a unanimous verdict of guilty against the defendant Vaszorich of murder in the first degree, with no recommendation, and so say you all.

The Court: Proceed.

The Clerk: Jurors, look upon the prisoner Brown. Members of the jury, who speaks for you, your forelady? Madam Forelady, how say you with reference to your verdict as to defendant Brown, guilty or not guilty in the manner as he stands charged in the indictment?

The Forelady: We find the defendant George Eugene Christian Brown guilty of first degree murder, with recommendations of life imprisonment.

The Court: Do you wish the jury polled, Mr. O'Hagan?

Mr. O'Hagan: Yes, if your Honor please.

The Court: Very well. You will render your own, individual verdicts as to the defendant Brown.

The Clerk: Gladys E. Kahle, how say you individually as to the defendant Brown?

The Forelady: Guilty of first degree murder, with recommendations of life imprisonment.

The Clerk: Robert E. Hill, how say you individually with reference to the defendant Brown?

Juror #2: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: Axel E. Palm, how say you individually with reference to defendant Brown?

Juror #3: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: Bessie L. McIntyre, how say you individually with reference to the defendant Brown?

Juror #4: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: Jane P. Cottrell, how say you individually with reference to defendant Brown?

Juror #5: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: Clarence R. Martin, how say you individually with reference to defendant Brown?

Juror #6: Guilty of murder in the first degree, with recommendations.

The Clerk: Marjorie L. Keilt, how say you individually with reference to the defendant Brown?

Juror #7: Guilty, with recommendation.

The Court: Recommendation of what?

Juror #7: Life imprisonment.

The Court: Very well.

The Clerk: May Gilmour, how say you individually with reference to the defendant Brown?

Juror #8: Guilty, with recommendations of life imprisonment.

The Clerk: Thomas J. Callahan, how say you individually with reference to defendant Brown?

Juror #9: Guilty, with recommendation of life imprisonment.

The Clerk: George F. Simpson, how say you individually with reference to defendant Brown?

Juror #10: Guilty, with recommendation for life imprisonment.

The Clerk: George F. Simpson, how say you individually with reference to defendant Brown—Or Charles D. Greene, how say you individually with reference to defendant Brown?

Juror #11: Guilty, with recommendations to life imprisonment.

The Clerk: John V. Hart, how say you individually with reference to defendant Brown?

Juror #12: Guilty of murder, with recommendation of life imprisonment.

The Court: Very well. The verdict as rendered by the individual jurors as to the defendant Brown may be recorded.

The Clerk: Hearken to your verdict as the Court has ordered it recorded. You say you find a unanimous verdict of guilty against defendant Brown of murder in the first degree with a recommendation for life imprisonment, and so say you all.

The Court: You may proceed as to the defendant Berry.

The Clerk: Jurors, look upon the prisoner Brown (sic). Who speaks for you, your forelady? Madame Forelady, how say you as to defendant Berry, guilty or not guilty in the manner and form as he stands charged in the indictment?

The Forelady: We find the defendant Robert John Berry guilty of first degree murder, with recommendations to life imprisonment.

The Court: Do you wish the jury polled, Mr. McCurrie?

Mr. McCurrie: Yes, if you please.

The Court: You will render your own individual verdicts as to the defendant Berry.

The Clerk: Gladys E. Kahle, how say you individually with reference to defendant Berry?

The Forelady: Guilty of first degree murder, with recommendations of life imprisonment.

The Clerk: Robert E. Hill, how say you individually with reference to defendant Berry?

Juror #2: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: Axel E. Palm, how say you individually with reference to defendant Berry?

Juror #3: Guilty of first degree murder, with recommendation of life imprisonment.

The Clerk: Bessie L. McIntyre, how say you individually with reference to defendant Berry?

Juror #4: Guilty of first degree murder, with recommendations for life imprisonment.

The Clerk: Jane P. Cottrell, how say you individually with reference to defendant Berry?

Juror #5: Guilty of first degree murder, recommendation for life imprisonment.

The Clerk: Clarence R. Martin, how say you individually with reference to defendant Berry?

Juror #6: Guilty of first degree murder, with recommendations for life.

The Clerk: Marjorie L. Keilt, how say you individually with reference to defendant Berry?

Juror #7: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: May Gilmour, how say you individually with reference to defendant Berry?

Juror #8: Guilty of first degree murder, with recommendation of life imprisonment.

The Clerk: Thomas J. Callahan, how say you individually with reference to defendant Berry?

Juror #9: Guilty of first degree murder, with recommendation of life imprisonment.

The Clerk: George F. Simpson, how say you individually with reference to defendant Berry?

Juror #10: Guilty of first degree murder, with recommendation for life imprisonment.

The Clerk: Charles D. Greene, how say you individually with reference to defendant Berry?

Juror #11: Guilty, with recommendations of life imprisonment.

The Clerk: John V. Hart, how say you individually with reference to defendant Berry?

Juror #12: Guilty of murder, with recommendations for life imprisonment.

The Court: The verdict as rendered by the individual jurors concerning the defendant Berry may be recorded as rendered.

The Clerk: Hearken to your verdict as the Court has ordered it recorded. You say you find a unanimous verdict of guilty against defendant Berry of murder in the first degree, with a recommendation for life, and so say you all.

The Court: The prisoners may be remanded."

It should be at once observed that the jury's verdicts as rendered by the forelady in all three cases were in compliance with the provisions of *R. S.* 2:138–2 (superseded by *N. J. S.* 2A:113–2) and *R. S.* 2:138–4 (superseded by *N. J. S.* 2A:113–4) under which it is imperative that the jury "shall * * * designate by their verdict whether it be murder in the first degree or in the second degree" and that the death sentence shall be exacted "unless the jury shall by its verdict, and as a part thereof, * * * recommend imprisonment at hard labor for life." Thus, but for the fact that the jury was polled in each case, the sentences of death upon Vaszorich and of life imprisonment upon Brown could not have been impugned for any defect in the verdicts as returned by the forelady for the jurors collectively.

The verdicts are asserted to be nullities solely by reason of the failure of Jurors 4, 7 and 11 in the Vaszorich case, and of Jurors 7 to 12, both inclusive, in the Brown case, to specify on the poll of the individual jurors "first degree murder" as the degree of the crime of murder of which each found the respective defendants guilty.

The correctness of the two verdicts as rendered by the forelady distinguishes the question in these cases from the question presented in the *Turco, Cooper* and *Greely* cases. Each of those decisions turned upon the effect of a deficient collective verdict which it was held was not corrected in any fashion. In the *Turco* and *Cooper* cases a collective verdict simply of "guilty" rendered by the foreman was held not to warrant a conviction of first degree murder and a sentence of death, in view of the statutes above cited; and no curative inference could properly be drawn from the fact that the indictment, the charge to the jury and the State's evidence and theory of the case all were predicated upon either a verdict of first degree murder or an acquittal. So too, in the *Greely* case the collective verdict as rendered by the foreman declared the defendant "guilty as charged, with a recommendation of life imprisonment." We held that that form of verdict also was inadequate and could be cured neither by inference arising from the recommendation, a feature exclusively characteristic of first degree murder verdicts, nor by a poll in which each juror used precisely the same words.

Here we have no occasion to consider how such a defective. or uncertain collective verdict may be cured, by a poll, *cf. State v. Cleveland, supra,* at 322, *People v. Orr,* 138 *Misc.* 535, 246 *N. Y. S.* 673 (*Cty. Ct.* 1930), *Solar v. United States,* 86 *A. 2d* 538 (*Mun. Ct. App. D. C.* 1952), or indeed by any means short of the jury's retirement and reconsideration and the rendering of a sufficient return. The question is solely whether an adequate collective verdict, as rendered by the foreman, is to be vitiated by informal responses of some of the jurors upon the poll.

It "is a solemn obligation * * * in a matter of the utmost gravity" of the court as well as of the jury to insure that no one be convicted of first degree murder "by intendment or a presumption based upon the evidence," or by "an inference because a juryman fails to dissent," or by "the failure of the accused, at the time of sentence, to question the sufficiency of the verdict," or other than by a ver-

dict "specific," "direct and positive." *State v. Cooper, supra; State v. Cleveland, supra; State v. Johnson,* 46 *La. Ann.* 5, 14 *So.* 295 (*La. Sup. Ct.* 1894). In this light must we consider the nature and purpose of a poll of the jury following upon a correct collective verdict.

The right of the accused on trial to request a poll of the jury was given by *R. S.* 2:190–14 and is now found in *Rule* 2:7–9(*d*). It is not in New Jersey, as it is in some states, a matter lying within the discretion of the trial judge. The purpose of a poll is primarily to determine whether "there is not unanimous *concurrence*" of the jury in the verdict as rendered by the foreman, *Rule* 2:7–9(*d*). "The practice of long standing requires each juror to answer for himself, thus creating individual responsibility, *eliminating any uncertainty* as to the verdict as announced by the foreman," *State v. Cleveland, supra,* at 322.

In *Heinze v. State,* 42 *A.* 2d 128, 132 (*Md. Ct. App.* 1945), it was said:

"* * * when a jury is polled each juror is called by name and asked the question whether the verdict as delivered by the foreman is his verdict, in order to make sure that all of the jurors concur in the verdict. Each juror is called on to answer for himself in his own language; and while the exact words used by the juror in answering the clerk are not material, the answer clearly indicates the assent of the individual mind to the verdict."

The fact of individual *concurrence* is the objective, *State v. Hubbs,* 294 *Mo.* 224, 242 *S. W.* 675 (*Mo. Sup. Ct.* 1922); otherwise stated, "to ascertain from each juror whether his individual conclusion was correctly expressed by the verdict which the foreman had rendered," *Margulies v. State,* 153 *Md.* 204, 137 *A.* 896, 898 (*Md. Ct. App.* 1927). See also *State v. Thursby,* 245 *S. W.* 2d 859 (*Mo. Sup. Ct.* 1952); *Jackson v. State,* 147 *Ala.* 699, 41 *So.* 178 (*Ala. Sup. Ct.* 1906); *Anno., Ann. Cas.* 1912 *B,* 1236; 2 *Bishop's New Criminal Procedure* (2d ed.), 865, *sec.* 1003 (3). Thus it was held error in *State v. Boger,* 202 *N. C.* 702, 163 *S. E.* 877, 878 (*N. C. Sup. Ct.* 1932), to poll the jury by request-

ing each juror who voted for the announced verdict to stand, the court remarking:

> "The defendant was entitled as a matter of right to know whether each juror assented to the verdict announced by the juror who undertook to answer for the jury * * *. To poll the jury means to ascertain by questions addressed to the jurors, individually, whether each juror assented, and still assents, to the verdict tendered to the court."

 Although a poll of the jury is the right of the accused, it is not a necessary ingredient of his conviction, but must be requested by timely request, *Rule* 2 :7–9(*d*), and may be waived by a failure to make such request, *State v. Blisak*, 26 *N. J. Misc.* 197 (*Qtr. Sess.* 1948); *People v. Chamberlain*, 55 *Pac. 2d* 240 (*Cal. D. Ct. App.* 1936); *Asher v. Commonwealth*, 221 *Ky.* 700, 299 *S. W.* 568 (*Ky. Ct. App.* 1927); *People v. Schneider*, 154 *App. Div.* 203, 139 *N. Y. S.* 104 (*App. Div.* 1912); *Owens v. United States*, 61 *App. D. C.* 132, 58 *F. 2d* 684 (*D. C. Ct. App.* 1932); *Hommer v. State*, 85 *Md.* 562, 37 *A.* 26 (*Md. Ct. App.* 1897); *Anno., Ann. Cas.* 1912 *B*, 1236.

 The required assent of each juror to the correct verdict rendered by the foreman need not be in formal or literal style, provided only that it be unmistakable in meaning. *Heinze v. State, supra; Margulies v. State, supra.* Thus in *State v. Myers*, 7 *N. J.* 465, 484 (1951), where the jurors answered variously, "Yes," "Yes, sir," "It is," to the question put by the clerk to each of them whether murder in the first degree with a recommendation of life imprisonment was his verdict, we held that "each [juror] expressly indicated that was his verdict. Each juror announced his finding of the defendant's guilt and specified the degree of murder. The right to a poll of the jury * * * was fully satisfied."

*State v. Cleveland, supra,* is not contrary. There, as here, the foreman's verdict met the statutory requirements; but each juror merely answered "guilty" to the clerk's question "How do you find." This incomplete answer to an equivocal question distinguishes the case from *State v. Myers, supra,*

and clearly fell short of the law's requirement that the juror's answer upon the poll, whatever the words used, be unmistakable in meaning and clearly indicate his assent to the verdict announced by the foreman.

 We do not think that the jurors' answers under attack here violate this important safeguard. Notably each juror whose answer is challenged specified "no recommendation" in the case of Vaszorich, or "with recommendation of life imprisonment" in the case of Brown. Each of these statements, as noted above exclusively characteristic, in one or the other form, of a verdict of murder in the first degree, does not in New Jersey correct a collective verdict announced by the foreman if that collective verdict is deficient in failing to state the degree of the crime, *State v. Greely, supra,* although it is held otherwise by the majority of states which have passed upon the point. 41 *C. J. S., Homicide,* 247, *sec.* 404; *Wharton on Homicide* (*3d ed.* 1041), *sec.* 652; see *Milton v. State,* 22 *Ala. App.* 379, 115 *So.* 851 (*Ala. Ct. App.* 1928); *Hall v. Commonwealth,* 207 *Ky.* 718, 270 *S. W.* 5 (*Ky. Ct. App.* 1925); *Hobson v. Youell,* 177 *Va.* 906, 15 *S. E. 2d* 76 (*Va. Sup. Ct. App.* 1941).

We believe, however, that the inference necessarily suggested by the recommendation, or lack of it, may sufficiently show individual *concurrence* in a correct verdict, at least in combination with other factors. As was said in *Hall v. Commonwealth,* 270 *S. W.,* at *p.* 9:

"In finding the defendant guilty and fixing his punishment at death, which punishment could be inflicted only in the event the jury found him guilty of murder, the jury unerringly indicated the offense of which it found Hall guilty * * *."

But there are also indicia of concurrence here not present in the individual responses in *State v. Cleveland, supra.* In the case of Vaszorich each challenged answer was given after several other jurors had stated their assents in unexceptionable terms and differed from such other responses only in the failure to specify "first degree murder" in terms. In the Brown case the challenged answers followed in sequence

after the first six jurors had each announced "Guilty of first degree murder, with recommendation of life imprisonment"; again the answers under attack differed only in the failure to specify "first degree murder" in terms. This strongly suggests that the answers in each case were the product, not of ambiguity or misapprehension in the minds of the entire jury, as in the *Cleveland* case, but rather of momentary inadvertence to a form of expressing assent to the designation of the degree which, at best, is awkward for laymen to state, and such inadvertence for that reason should not be taken to evince any lack or failure of specific and fixed intent on the part of any of such jurors as to what the verdict in fact was. Trial judges might well minimize the chance of such inadvertent expressions by jurors by polling the jury in the manner used in *State v. Myers, supra,* which requires of each juror only the simple response "Yes," "it is," or the like. And that it was only such momentary inadvertence here is further shown by the fact that each juror in question, with the exception only of Juror 11, did specify "first degree murder" in terms in stating his assent to the verdicts in one or another of the three cases.

### DENIAL OF VASZORICH'S MOTION FOR A NEW TRIAL

The motion was based upon alleged newly discovered evidence, namely, a sworn statement of Berry, who did not appeal, which was given within a month after his confinement to State Prison under his life sentence. He states that it was he and not Vaszorich who wielded the steel worker's wrench; that Vaszorich had only a small bar in his hand; that both first struck Delhagen at about the same time; that when Delhagen awoke, Vaszorich threw him to the floor and held him down while Berry "hit him two or three more times" with the wrench; that Vaszorich then tied Delhagen with the Christmas tree light strings and left Berry to watch him while he searched the house for things to steal; that the victim "was still making quite a lot of noise so I hit him about six or seven more times on the head"; that he assisted

Vaszorich to drag Delhagen into the kitchen where "I hit him one more time" "still with the steel worker's wrench." He states, "I am making this statement only because I can't see John die for something I have done." Brown also swore to a statement which disclaimed any knowledge from observation that Berry had struck Delhagen with the bar he saw in his hands, but affirmed that Berry had told him he had hit Delhagen after he was dragged into the kitchen.

It is settled that the trial court's discretion to grant or deny a new trial upon the ground of alleged newly discovered evidence is to be guided by three criteria, namely, that "the new evidence (1) must be material to the issue and not merely cumulative nor impeaching nor contradictory; (2) that it has in fact been discovered since the former trial and could not have been discovered before such trial by the exercise of due diligence; (3) that it would probably change the result if a new trial was granted," *State v. Bunk*, 4 *N. J.* 482, 486 (1950); *State v. Hunter*, 4 *N. J. Super.* 531 (*App. Div.* 1949). In addition, where, as here, the alleged new evidence is recanting testimony, a particularly unreliable form of proof, and if true, involves a confession of perjury, we approach the question whether the trial judge erred in exercising his discretion to deny a new trial mindful of the principle phrased by Mr. Justice Cardozo in his concurring opinion in *People v. Shilitano*, 218 *N. Y.* 161, 112 *N. E.* 733, 739 *L. R. A.* 1916 *F*, 1044 (*N. Y. Ct. App.* 1916):

"* * * I do not mean that to justify a new trial, he must have been convinced—firmly or with a sense of certainty convinced—that the first story of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was convinced that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. * * * He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph. He was charged with a responsibility to seek the truth himself."

Here the trial judge grounded his decision upon the conclusion that at least element (2) of the criteria was not

met, (and plainly that is so, for if Berry's recanting testimony is true, Vaszorich knew at all times that Berry and not he wielded the steel worker's wrench, and the evidence was thus not newly discovered at all), and also upon his disbelief of the recanting testimony, stating:

"It is amazing but at the same time regrettable that a young man of the age of seventeen years by the name of Berry should have so completely and so soon in life lost his soul. When I compare the statements now made by Berry with his sworn testimony under oath and his statement to the Court when the imposition of sentence was given, I cannot come to any conclusion other than to say that it is unbelievable, and I do not believe it. If he is now telling the truth in his affidavit, he is guilty of perjury."

We have no difficulty whatever in reaching the conclusion that the argument by Vaszorich that Judge Giordano did not properly exercise his discretion is wholly without substance. Berry had nothing to lose by recanting; he was content with having escaped the death penalty and did not appeal. His life not being forfeit, nor could it be, he plainly perjured himself, obviously from some twisted sense of loyalty to his companion in depravity.

The judgments on appeal are affirmed.

WACHENFELD, J. (dissenting). The killing was vicious, cruel and bloody, and the gruesome details need not be recited further than to say that death was the result of an assault and robbery and under the statute was murder in the first degree.

But the constitutional guarantees of a fair trial are not impaired by the abundance of evidence against the accused, nor is the law to be altered or the trial errors condoned or excused because of evident guilt, if in fact they resulted in manifest wrong and injury.

I am in accord with the majority opinion except as to two points. I think there was error in the return of the verdict, which was a nullity for failure to comply with the statute by reciting the degree of murder of which the defendants were

convicted, and in the distribution of the so-called "blue book" with the legend set forth therein.

It is not disputed that three of the jurors in the Vaszorich case, when polled, upon being asked to declare their verdict, merely responded: "Guilty, with no recommendation," without specifying the degree of murder as required by the statute. As to Brown, six jurors, when polled, replied: "Guilty, with a recommendation of life imprisonment."

The statutory requirement as to the way and manner such verdict must be returned is found in *N. J. S.* 2A:113–2:

"A jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first degree or in the second degree."

This court, in *State v. Cooper*, 2 *N. J.* 540 (1949), said it was *"imperative* in its command," it was "a *solemn obligation* * * * in a matter of the *utmost gravity,"* "the Legislature deemed it essential that in resolving an issue involving the death penalty or life imprisonment the finding be specific and not left to conjecture."

In *State v. Cleveland*, 6 *N. J.* 316 (1951), the unanimous court repeated:

"The question involves more than a technical violation of a statute or rule of procedure. * * * The finding must be specific and in *exact accord with the statutory mandate."*

The same forceful language was used four months ago in *State v. Greely*, 11 *N. J.* 485 (1953):

"It is the duty of the jury to find a verdict in compliance with the statutory mandate and the *degree of murder of which the defendant is guilty is a specific prerequisite."*

The majority opinion concedes that under the statute "it is imperative that the jury 'shall * * * designate by their verdict whether it be murder in the first degree or in the second degree.' " It admits that on the poll the jurors failed to specify the degree of murder, but with seeming

inconsistency then sustains the verdict because the failure of the jurors to specify the degree of murder was due to "momentary inadvertence" and their conduct did not evince a lack of "fixed intent" and concludes that "the inference necessarily suggested by the recommendation * * * may sufficiently show individual concurrence in a correct verdict * * *."

In other words, inferences can be drawn as to what the jurors meant or intended and their failure to comply with the statute is to be excused because of "momentary inadvertence."

In *State v. Cleveland, supra*, however, we said just the opposite:

"Such a determination cannot be left to inference. The finding must be specific and in exact accord with the statutory mandate."

And then to dispel any doubt as to this rule's application in a poll of the jury, we said:

"We think the law clearly demands that when a jury in a murder case is polled, each juror, if he finds the defendant guilty, shall designate by his verdict whether it be murder in the first degree or in the second degree.
This was not done in the case under consideration, and we think it constituted prejudicial and therefore reversible error."

It was not new law, for in *State v. Cooper, supra*, we said it is "essential that in resolving an issue involving the death penalty or life imprisonment the finding be specific and not left to conjecture."

Then, to make "assurance doubly sure," in *State v. Greely, supra*, we said compliance with the statutory mandate as to the degree of murder was a "specific prerequisite."

To me the factual situation here is identical. The Constitution is the same; the statute still remains in full force and effect on our books. The only difference is that Cleveland, Cooper and the others have been disposed of and Vaszorich and Brown are answering at the bar of justice. The rule as to them is different; it has been changed and Vaszorich's

death is decreed with little thought to the standards applied by us to others under the same circumstances.

No tribunal, high or low, has the right to take life without strict compliance with the legislative and constitutional mandates permitting it, nor is the judicial reasoning of such substance, quality or stability as to be an adequate substitute for the enacted provisions.

The comforting faith in the equality of the criminal law and its impartial administration may well totter under the impact of the attempted distinction here made. My bewilderment lies in my inability to reconcile the inconsistent treatment and results arrived at under the same law.

Also, there was distributed to the entire panel of prospective jurors a so-called "blue book" of 28 pages, entitled "Primary Instructions to Jurors," containing this statement: "Facts and Principles with Which Every Juror Should Make Himself Familiar." It had printed on its face in large letters, "Compliments of the Sheriff." This advertisement admittedly had many errors not disputed by the majority opinion, including an improper definition of reasonable doubt quite contrary to what was ultimately charged by the trial judge. The booklet was given to the jurors without authority of any court, and they had it in their possession for four or five days. The concluding page of this catalogue of misleading "facts and principles" was devoted exclusively to this admonition, prominently and impressively displayed:

"On the head of the criminal lies the crime; but in a miscarriage of justice the jurors delinquent become participants of guilt." Lycurgus

History tells us that the author's Spartan leadership existed in the Ninth Century B. C. His qualifications for instructing our jurors in this jurisdiction and in this age are absent from the record.

On oral argument the prosecutor honestly and freely admitted this quotation was not good law and he did not even undertake to defend it. That was left to us as another judicial chore if we would sustain the judgment below.

Realistically, this coined phrase trampled upon the constitutional privileges of the defendants and annihilated their rights by denying to them the presumption of innocence and the requirement that the prosecution prove its case beyond a reasonable doubt. It replaced these two fundamental principles, constituting the very foundation of our criminal law, with a threat that unless there was a verdict of guilty, the jurors who asserted their independence, did their own thinking, and followed the law would themselves be guilty of a crime.

A greater trespass upon the primary rights of the prisoners is difficult to conceive. We have humbly said: " 'A thing in writing carries, particularly with the layman, a weight of its own,' " and such an incident "shears the balance of the oral testimony in the case of the weight it would otherwise have and is erroneous." *State v. Cleveland, supra.*

The gravity of the situation was recognized by the trial court when, referring to the booklets, it said they "might be misleading when in the hands of laymen who know nothing about the law" and therefore ordered that the books be taken from the jurors. However, this action and what was said by the court were obviously ineffective as a cure for an error so prejudicial and glaringly defiant of our concept of essential and fundamental justice.

The harm occasioned by the written erroneous instructions as the guide by which the jurors were to determine the fate of the defendants, absorbed by and impressed upon them by having physical possession of the erring document for days, could not be overcome that easily. "A thing in writing carries a weight of its own," and a nullification of its imprint under the admitted circumstances is difficult of accomplishment.

The solemnity of the method of taking a verdict in a first degree murder case as required by the statute has been in existence for 35 years, *State v. Turco,* 98 *N. J. L.* 61 (*Sup. Ct.* 1922), and has been confirmed by this court on three different occasions within the last few years in strong and

unequivocal language; yet the majority sees a difference in the case *sub judice* which I am unable to discern.

In effect, it changes the law, and if a change is to be made, we should at least recognize the right of the Legislature to make it instead of usurping its prerogative. Here in substance we now refuse to enforce a legislative directive which we have already upheld and termed a "solemn obligation," "imperative in its command," of the "utmost gravity," and which the courts have supported since its enactment in 1917.

Apparently we do not mean what we said a few months ago, no matter how emphatically or plainly we expressed it. In fact, we have just changed our mind and that, it seems, should be sufficient, but Vaszorich is going to have difficulty understanding it.

His treatment is contrary to the standards heretofore unanimously agreed upon and accorded to others. I doubt if my difficulty is due to my lack of experience in criminal matters. Nevertheless, my analysis of the issues involved, with the pronounced authorities, compels me to conclude that the death warrant here, when issued, must be classified as "expedient" rather than "legal."

I would reverse as to both defendants.

Mr. Justice HEHER and Mr. Justice BURLING concur in this dissent.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, JACOBS and BRENNAN—4.

*For reversal*—Justices HEHER, WACHENFELD and BURLING —3.