ANNETTE DUFFY, ADMINISTRATRIX *AD PROSEQUENDUM* OF THE ESTATE OF JOHN JAMES DUFFY, Jr., PLAIN-TIFF-APPELLANT, v. DANIEL BILL, Jr., *ET AL.*, DEFENDANTS, AND THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued March 7, 1960—Decided May 9, 1960.

280

Mr. *Stanley W. Greenfield* argued the cause for the plaintiff-appellant.

Mr. *Francis X. Crahay* argued the cause for the defendant-respondent (*Messrs. Hanlon, Argeris and Crahay,* attorneys; *Messrs. William F. Hanlon and Francis X. Crahay,* of counsel).

The opinion of the court was delivered by

BURLING, J. This case arises out of a railroad grade-crossing collision in which John J. Duffy, Jr., was killed. At the time of his death, Duffy was a passenger in an automobile driven by Daniel Bill, Jr. Plaintiff, administratrix *ad prosequendum* of the estate of the decedent, brought suit in the Superior Court, Law Division, to recover damages under *N. J. S.* 2A:31–1 *et seq.* in her own behalf as decedent's wife and in behalf of decedent's two minor children. Defendants in this action were Daniel Bill, Jr., the Central Railroad of New Jersey (hereinafter referred to as the Railroad), and the Jersey Central Power and Light Company (hereinafter referred to as the Power Company). Defendant Bill filed a third-party complaint against the two corporate defendants. After a trial, the jury returned a verdict in favor of plaintiff and against the defendant Bill, but against plaintiff and in favor of the corporate defendants. On the third-party action, the jury found in favor of the defendants and against the third-party plaintiff, Bill. Bill did not appeal with regard to any phase of the matter below, nor did plaintiff appeal from the jury's verdict in favor of the Power Company. Plaintiff did prosecute an appeal, however, to the Superior Court, Appellate Division, from the verdict in favor of the Railroad. While the cause was pending there and prior to argument, we certified it on our own motion.

The crossing at which the collision in question occurred is located in Union Beach, New Jersey, in a built-up portion of that town. The railroad tracks, a single set, run east

and west. Florence Avenue crosses the tracks on an oblique angle, running northeast to southwest. The automobile involved in the collision in question was proceeding along Florence Avenue towards the north, and the train, a three-car passenger train drawn by a Diesel locomotive, was proceeding westward. To the south and east of the grade crossing there is an open field which extends 250 feet to the south along Florence Avenue and about 240 feet to the east along the railroad tracks, affording the traveler approaching the crossing from the south a clear view for these distances of trains approaching from the east. The tracks curve slightly along the entire portion between the Florence Avenue crossing and the next crossing to the east, presenting a concave appearance to a person facing the tracks from the south. At the southeast corner of the Florence Avenue crossing stands a cross-buck sign informing approaching travelers of the presence of the railroad tracks. Although no other warning device is located at the crossing, it is apparently admitted that this condition violates no statutory prescription or public-utility-commission regulation. North of the tracks and east of Florence Avenue are a parking lot and buildings owned by the Power Company. There is testimony that at nighttime the illumination of the parking lot shines directly at persons proceeding north on Florence Avenue and looking east down the railroad tracks but it is difficult to determine from the record, other than from the testimony of Bill, the extent to which these lights interfere with the vision, if at all.

The collision in question occurred at night, at about 9:30 P. M. The train, proceeding westward, was gaining speed and had reached about 40 miles per hour before its brakes were applied. There is ample proof from which the jury could determine that the train's horn was blowing at least during the time the train was within 900 feet of the crossing until the occurrence of the collision and that the locomotive carried a bright electric headlight which was operating. There was also testimony that the automobile which was

driven by the defendant and third-party plaintiff Bill approached the crossing "very fast" and although its brakes were applied in a desperate last-minute effort to avoid the accident, the car did not stop until after it collided with the train. Bill testified, however, that he approached the crossing carefully, stopped and attempted to discern whether a train was coming towards him, and seeing or hearing no train, proceeded across and was struck. Bill further testified that the parking-lot flood lights on the property of the Power Company prevented him, when stopped 15 feet from the tracks, from observing further than 100 feet to the east. He also stated that he had no warning of any kind of the approach of the train.

The fireman on the locomotive, who was seated on the side of that vehicle from which the automobile driven by Bill approached, testified that the bell was rung and the horn sounded from a point well before the Florence Avenue crossing. He stated that he first sighted the Bill car when the train was approximately 300 feet from the crossing, and that when it became apparent that the car would not stop, at which time the train was approximately 260 feet from the crossing, he applied the locomotive's emergency brakes. The engineer, who was on the far side of the locomotive from that from which Bill's car approached, testified that the bell and horn were sounded from a point well before the Florence Avenue crossing. The engineer stated that he could not see the car until it was hit because of the curve in the tracks, and that the emergency brakes were not applied until shortly before the collision took place.

Plaintiff contends that the trial court erred in the following respects: first, in failing to submit to the jury the question of whether the crossing in question was hazardous and hence required extra precautionary devices to be used by the Railroad in warning travelers of an approaching train; second, in failing to submit to the jury the question of whether the collision was caused by the negligent operation of the train; and third, in failing to allow certain expert

testimony sought to be introduced by plaintiff, apparently to be directed to the necessity of additional warning devices.

The plaintiff, in her brief, contends that the trial court erred in charging the jury in the following manner:

"If you find that the defendant, The Central Railroad Company of New Jersey, · operated its train on which a bell was placed weighing not less than 30 pounds which was rung continuously in approaching Florence Avenue or sounded a whistle or horn at intervals beginning 300 yards from the crossing until the engine of the train reached the crossing, then you must find that the defendant committed no acts of negligence and return a verdict of No Cause of Action in favor of the defendant, The Central Railroad Company of New Jersey.

It is not your function and you must not consider the adequacy of the protection provided at the crossing in question. The statute I quoted above is the total duty required of the defendant, The Central Railroad Company of New Jersey. The railroad is not required to keep flagmen nor to give any other notice of the approach of their trains other than those signals mentioned above; and, as I stated to you, if you find that the railroad maintained a bell on the engine and rung it continuously, or sounded its horn, as I stated to you above, then you must find for the defendant, The Central Railroad Company of New Jersey.

It is the function of the Legislature, and not the function of this court or you members of the jury to determine the adequacy of the protection provided by the railroad company at this crossing."

Plaintiff argues that the above portion of the trial court's instructions to the jury constituted error in two respects: first, that, although the controlling cases in this State limit a railroad's duty of warning travelers on grade crossings of approaching trains, in the absence of an extraordinary danger created by the railroad itself, to the giving of the warning signals required by statute, these cases ought to be overruled, with the effect that any extraordinary hazard at a crossing would require that the railroad take extra precautions in warning of approaching trains, regardless of the source of its creation, and second, that the quoted portions of the charge prevented the jury from considering whether the Railroad through its agents was negligent in its operation of the train. Each of these asserted errors will be considered in turn.

The legislative history of the law governing the standard of care owed by a railroad to travelers on grade crossings began with an act passed March 9, 1839, whereby the Legislature provided that:

"Every incorporated company that hath been, or hereafter may be, authorized to construct any railroad in this state, shall cause to be placed on some part of every locomotive engine used by any such company, a bell, of a weight not less than thirty pounds, which they shall cause to be rung, at the distance of at least three hundred yards from the place where any such railroad crosses a turnpike road or highway upon the same level with the said railroad, and be kept ringing until the engine has crossed such turnpike or highway, or has stopped." *Nixon's Digest* 680 (2d ed. 1855).

The same statute, with minor changes only, exists today. *R. S.* 48:12–57, as amended, *L.* 1948, *c.* 252, § 1. At the same time as the statute quoted above was enacted, the Legislature enacted a law which, in its modern form, states:

"Every railroad company shall maintain at each highway crossing at grade a conspicuous sign with such inscription and of such standard and design as shall be approved by the board of public utility commissioners, so as to be easily seen by travelers." *R. S.* 48:12–58.

It is provided by *R. S.* 48:12–54, which began as *L.* 1914, *c.* 181, § 1, that "safety gates, flagmen, electric bell, electric signs or other recognized system of alarm or protection approved by the board of public utility commissioners" must be maintained where railroad tracks cross "any public road which is improved by joint action of the state and a municipality or county," which does not apply to the crossing in question. *R. S.* 48:12–55, which began as *L.* 1914, *c.* 181, § 2, allows the Board of Public Utility Commissioners, on its own initiative or after a complaint, to compel compliance with *R. S.* 48:12–54. *R. S.* 48:2–29, which began as *L.* 1911, *c.* 195, § 22, allows the Board of Public Utility Commissioners, "whenever it appears" to them that conditions at a crossing require warning devices, to order such devices installed. Prior to the statutory revision of 1937,

there was an act, *L.* 1903, *c.* 257, § 36, which allowed the Chancery Court, upon the filing of a petition seeking installation of safety devices at a railroad crossing, to order such installation should it be deemed to be in the public interest. This act was not re-enacted in the revision of 1937. See also *L.* 1898, *c.* 66, repealed (allowing a governing body of a municipality to petition the Chancery Court for similar relief). These statutes influenced the cases which developed the standard of care applicable to railroads to warn travelers at grade crossings of approaching trains.

Moving to the case history of this subject, the earliest reported case dealing with grade-crossing collisions appeared to describe the railroad's duty as being to exercise reasonable care under the circumstances. *Moore v. Central R. R.,* 24 *N. J. L.* 268 (*Sup. Ct.* 1854), affirmed 24 *N. J. L.* 824 (*E. & A.* 1854). It was pointed out in a subsequent case that since the momentum of railroad trains prevented them in many cases from stopping to avoid collisions upon grade crossings, "proper signals" must be given. *Runyon v. Central R. R.,* 25 *N. J. L.* 556, 558 (*Sup. Ct.* 1856). In *Telfer v. Northern R. R.,* 30 *N. J. L.* 188 (*Sup. Ct.* 1862), the question of the sufficiency of the warning given by a railroad at a crossing was directly presented. The court there held that there was no evidence to justify a finding that the railroad was negligent in failing to provide a flagman to protect the crossing. It was stated, however, that the "care to be used in avoiding a collision with an ordinary vehicle upon a highway must be in proportion to the danger incident to the particular locale," *Id.,* at *page* 193. Noting that the crossing was located in a sparsely settled area, with no serious obstructions to view, and that an approaching train could be seen for long distances from the crossing, the court stated:

"No municipal or legislative requirement rendered it obligatory upon the company to have a flagman there. In the absence of such requirement, it should have appeared that there was something to distinguish this from ordinary crossings, some peculiarity in the character of the ground, which so plainly indicated the necessity of

a flagman as to leave no doubt of the obligation of the company to put one there." *Id.*, at *page* 194.

Thus it appears that the earliest cases on this subject were moving toward a measure of care which would require the statutory signals to be given in any event and which would also require extra warning devices to be provided when the permanent circumstances of the crossing, as distinguished from purely temporary hazards such as meteorological conditions, were such as to render it extraordinarily dangerous. Also, extra warning devices would be required where the danger, even if only temporary, was created by the railroad itself. *New Jersey R. R. & Transportation Co. v. West,* 32 *N. J. L.* 91 (*Sup. Ct.* 1866), affirmed 33 *N. J. L.* 430 (*E. & A.* 1867).

In *Pennsylvania R. R. v. Matthews,* 36 *N. J. L.* 531 (*E. & A.* 1873), a measure of care of considerably different proportions was set down. In that case the plaintiff charged the railroad with negligence for failure to place a flagman at the crossing at which the collision occurred. It appears that the approach of the train was difficult to discern from the crossing because at that point the tracks, in the direction from which the train came, curved and came out of a deep cut and because two buildings owned by the railroad were placed in such a way as to block the view of anyone approaching the crossing and attempting to ascertain whether it was safe to cross. The trial court left the question of whether the crossing was extraordinarily hazardous, in which case extraordinary precautions were required, to the jury. This procedure was affirmed by the appellate court in the following language:

"* * * I quite agree to the remark made by one of the English judges, that the question whether flagmen are to be required to be kept at every cross-road, is not to be left to the caprice of juries. The statute which confers upon a railroad the right to make a track and work it, by necessary implication, subjects the public to the ordinary risks attendant on the exercise of the privileges thus granted. Under usual circumstances, in the open country, they can run as many trains, and at as great a rate of speed, as are con-

sistent with the safety of their passengers. They are not called on to keep flagmen, under ordinary circumstances, at cross-roads, nor to give any other notice of the approach of their trains than those signals that are prescribed by statute. If greater safeguards are requisite for the safety of the community, and those public agents are to be put under greater restrictions in the exercise of their franchises, such contrivances must proceed from the legislative, and not from the judicial power.

But while I thus say that these additional burthens cannot be imposed by the courts upon these companies, I also say, at the same time, and with quite as much emphasis, that the companies may, by their own conduct, impose such burthens on themselves. If one of them chooses to build its track in such a mode as to unnecessarily make the use of a public road which it crosses, greatly dangerous, I think such company, by its own action, must be held to have assumed the obligation of compensating the public for the increased danger * * * The rule is, as I understand it, that when the company has created extra danger, it is bound to use extra precautions. If the track is put in a position where the trains, when close to their transit over a public street or road, cannot be seen, this is an extra danger which calls for more than the ordinary cautionary signals. I can see no difficulty in applying this rule; it will, obviously, be very much under the control of the court." 36 *N. J. L.*, at *pages* 534, 535.

In the absence of any extraordinary hazard at a crossing obliging the railroad to take such steps as would be necessary in addition to the statutory signals to make the crossing safe, the rule of the *Matthews* case imposes such a duty only when the hazard was created by the railroad itself.

The cases which followed conformed with the formula set forth in *Matthews*. See, *e. g.*, *Delaware, Lackawanna & Western R. R. v. Toffey*, 38 *N. J. L.* 525 (*E. & A.* 1875); *Hires v. Atlantic City R. R.*, 66 *N. J. L.* 30 (*Sup. Ct.* 1901); *Jones v. Pennsylvania R. R.*, 78 *N. J. L.* 571 (*E. & A.* 1910); *Ross v. Director General of Railroads*, 94 *N. J. L.* 295 (*Sup. Ct.* 1920); *Grover v. New York, Susquehanna & Western R. R.*, 1 *N. J. Misc.* 517 (*Sup. Ct.* 1923); *Tota v. Pennsylvania R. R.*, 104 *N. J. L.* 330 (*E. & A.* 1928); *Lundkvist v. Erie R. R.*, 7 *N. J. Misc.* 275 (*Sup. Ct.* 1929); *Pangborn v. Central R. R.*, 18 *N. J.* 84 (1955). The manner in which it was stated and applied, however, was by no means uniform.

It always was clear that giving the statutory warning signals was sufficient to absolve the railroad from liability in the absence of an extraordinary danger created by the railroad. *New York, Lake Erie & Western R. R. v. Leaman,* 54 *N. J. L.* 202 (*E. & A.* 1891). But what could be considered an extraordinary danger created by the railroad was less certain. The *Matthews* opinion had stated that "if the track is put in a position where the trains, when close to their transit over a public street or road, cannot be seen, this is an extra danger which calls for more than the ordinary cautionary signals." 36 *N. J. L.,* at *page* 535. The cases immediately following it took this language literally and held that if the railroad constructed its tracks in a manner that made the crossing hazardous, the railroad was not relieved of liability merely by giving the statutory warning signals. *Delaware, Lackawanna & Western R. R. v. Toffey,* 38 *N. J. L.* 525 (*E. & A.* 1875); *Delaware, Lackawanna & Western R. R. v. East Orange Twp.,* 41 *N. J. L.* 127 (*Sup. Ct.* 1879); *New York, Lake Erie & Western R. R. v. Randel,* 47 *N. J. L.* 144 (*E. & A.* 1885). And in *Delaware, Lackawanna & Western R. R. v. Shelton,* 55 *N. J. L.* 342 (*E. & A.* 1893), the court pointed to a fence, a railroad car on a siding, and buildings not on railroad property, all of which obstructed the traveler's view at the crossing, as reason for allowing the jury to find that extraordinary precautions were necessary. Thus there remained at this point an opportunity to develop the standard of care to require the railroad to provide extra warning at the crossing which, though safe when originally built, had become hazardous by the development of buildings or other obstructions not on railroad property. This matter was settled, however, in *Siracusa v. Atlantic City R. R.,* 68 *N. J. L.* 446 (*Sup. Ct.* 1902). In that case it was stated that:

"It is only where by the configuration of the country or by the existence of buildings the situation is such that the use of the statutory signal would fail to give reasonable notice to those having

occasion to cross the railroad that the company is required to use additional precautions for the public safety. But such danger must have existed when the railroad was constructed, or it must have been subsequently created by the railroad company." *Id.*, at *page* 447.

See also *Danskin v. Pennsylvania R. R.*, 76 *N. J. L.* 660 (*E. & A.* 1909). Even so, some later cases held that obstructions to view not located on railroad property would not be considered sufficient to impose extraordinary duties upon the railroad, without mention of whether the obstructions existed when the track was put in place. *Danskin v. Pennsylvania R. R., supra; Horandt v. Central R. R.*, 78 *N. J. L.* 190 (*Sup. Ct.* 1909), affirmed 81 *N. J. L.* 488 (*E. & A.* 1911). Thus, the development of the cases indicates that courts were loath to increase the duty of the railroads relating to crossing safeguards, an attitude which, perhaps, was a reflection of the important part contributed by railroads to the industrial development of this State and the entire country and that railroads should be permitted to perform their function with as little interference as possible.

This trend also was evident in other cases. In *Kyle v. Lehigh Valley R. R.*, 81 *N. J. L.* 186 (*Sup. Ct.* 1911), it was stated that the creation of an additional element of risk by the railroad was not alone sufficient to subject it to a duty of additional care in warning travelers on grade crossings of an approaching train. Rather, it is only when the risk is of such an extent that prudent persons cannot use the crossing with safety that the extraordinary duty applies. See also *Spargo v. Central R. R.*, 84 *N. J. L.* 251 (*E. & A.* 1913). In *Dando v. Director General of Railroads*, 94 *N. J. L.* 285 (*Sup. Ct.* 1920), it was held that it was not sufficient reason to hold a crossing extraordinarily dangerous because the road traversed five sets of tracks. And in *Swenson v. Delaware, Lackawanna & Western R. R.*, 99 *N. J. L.* 403 (*E. & A.* 1924), it was decided that a railroad would not be held to extra caution when the view from the crossing was obstructed by railroad cars standing on a siding, the reason being that no extraordinary duty could attach by

reason of the ordinary operation of a railroad, which included placing cars on sidings. See also *Morris v. Atlantic City R. R.,* 100 *N. J. L.* 328 (*E. & A.* 1924).

It is this history from which has emerged the measure of care which is brought for reconsideration in this case. It remains to be seen whether there exist appropriate reasons for changing its dimensions.

The rule that a railroad owes a traveler upon a crossing no duty of warning of an approaching train other than that provided by statute has been explained by stating that the Legislature's pronouncements concerning warning signals are intended to be the exclusive source of control over railroads in such situations. *West Jersey R. R. v. Abbott,* 60 *N. J. L.* 150, 153 (*E. & A.* 1897). Such may be the effect of the rule, but not its cause, since under such a view it would be impossible to explain the exception existing when the railroad creates an extraordinary hazard. The statute makes no exception, and if the statute were the exclusive standard of care, no exception could exist in the cases. That an exception does exist there demonstrates that the court is not bound on this question by legislative enactment. It would be entirely consistent with the statutes providing for warning signals to be given at crossings by railroads to hold, for example, that such statutes provide minimum or supplementary, not maximum or exclusive, standards of care. 3 *Shearman & Redfield, Negligence,* § 454, *p.* 1093, and *n.* 96 (*Rev. ed.* 1941). It remains, therefore, to consider whether the standard of care to be exercised by railroads in warning travelers on crossings of approaching trains is ripe for overhaul.

Perhaps the most obvious and notable change in the transportation habits of our society has been the great increase in the use of highways and the speed of vehicles. The development of the automobile and the extent of its use by the public at large has wrought changes too obvious and too numerous to require citation. Suffice it to say that there are so many automobiles currently in use for so many vary-

ing purposes that they threaten to choke our metropolitan centers by their numbers and to clog our highways to the point where their use becomes a major effort. See *Gundaker Central Motors v. Gassert*, 23 *N. J.* 71, 82 (1956). In view of this situation, we shall re-evaluate the measure of care under discussion in light of present conditions. It is readily apparent that the holding of the *Matthews* case, which results in a directed verdict in the railroad's favor on the question of adequate warning if the hazard was not created by the railroad and if the required statutory signals were given, does not easily fit into our present-day patterns of transportation. It does not account, to mention one case, for a situation where a road maintained solely by a county or municipality is made hazardous at the point of a railroad crossing by, for example, structures not located on railroad property. A traveler using such a crossing, even though he might approach with abundant caution, could be injured by a passing train yet be remediless against the railroad if the operator of the train rang a bell or sounded a whistle or horn for 300 yards before the crossing. No matter what may have been the proper result from a consideration of the parties' respective opportunity to avoid a collision in this situation in past eras, reconsideration in view of the conditions prevailing at this time suggests that the railroad should install some warning device or be liable for its failure to take such steps, provided the injured traveler is not otherwise precluded from recovery by his conduct. Nor it is sufficient to state that the Public Utility Commission has the power to require the railroad to install warning devices in such situations, *R. S.* 48:2–29, for the Public Utility Commission may not be aware of the danger until a number of collisions occur whereas the railroad is better able to acquaint itself with the hazards involved.

A just measure of care would seem to be that, although in the ordinary case the statutory warning is sufficient, extra hazards at crossings require extra precaution in warning travelers, whether or not the railroad has created

the hazard. The extra hazardous nature of a crossing is a question of fact for the jury, but not until the trial court first determines that there is sufficient evidence to warrant the question to be submitted. Ultimate recovery, of course, depends on the absence of contributory negligence on the part of plaintiff and the existence of a legally sufficient causal relationship between the collision and the railroad's failure to give proper warning of the approach of the train and of the unusual conditions at the crossing. By so eliminating from our law the requirement that plaintiffs must prove the hazard to be of the railroad's creation before extra warning precautions are required, we bring ourselves in line with the general rule prevailing elsewhere and we adopt that measure of due care. *New York Central R. R. v. Powell,* 221 *Ind.* 321, 47 *N. E. 2d* 615 (*Sup. Ct.* 1943); *Copithorn v. Boston & Maine R. R.,* 301 *Mass.* 510, 17 *N. E. 2d* 713 (*Sup. Jud. Ct.* 1938); *Tanzi v. New York Central R. R.,* 155 *Ohio St.* 149, 98 *N. E. 2d* 39 (*Sup. Ct.* 1951); Annotation 24 *A. L. R. 2d* 1161 (1952); 3 *Shearman & Redfield, Negligence,* § 454, *p.* 1094; § 459, *pp.* 1104–1106; § 472, *p.* 1160 (*Rev. ed. 1941*).

We are satisfied, however, that the trial court did not err in failing to give the question of the necessity for extra warning devices to the jury in this case. A review of the record in the matter at hand leads to the conclusion that there is no evidence from which a jury could determine that the ordinary statutory signals were not adequate warning. We hold, therefore, that, as a matter of law, the railroad's failure to provide extra precautions was not negligence under the facts of this case. There is no evidence from which a jury could determine that the sound of the horn and bell from the approaching engine and the presence of the warning sign were not sufficient warning to travelers approaching the crossing with the degree of care which the railroad is entitled to expect. *Cf. Gulder v. Pennsylvania R. R.,* 70 *N. J. L.* 196 (*Sup. Ct.* 1903); *Central R. R. v. Smalley,* 61 *N. J. L.* 277 (*E. & A.* 1897).

Nor do we give any weight to plaintiff's argument that the trial court erroneously excluded expert testimony intended to provide evidence that the railroad was negligent in not providing warning at the crossing beyond that required by statute. Expert testimony on the question of adequate warning is proper, perhaps even necessary in most cases. See *Telfer v. Northern R. R.*, 30 *N. J. L.* 188, 193 (*Sup. Ct.* 1862). We do not decide, however, whether the trial court properly excluded the expert testimony offered in this case, because the proper groundwork was not laid for a consideration of this question on appeal. Our rule on the subject is clear.

"In an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he expects to prove by the answer of the witness." *R. R.* 4:44–3.

Without such a specific offer of proof, which was not made here, it is virtually impossible for the appellate court in reviewing the case to determine whether the exclusion had a prejudicial effect, and, the burden of such a showing being on the appellant, there can be no remand for a new trial because of the exclusion without an offer of proof. See *Steffler v. Schroeder*, 12 *N. J. Super.* 243, 248 (*App. Div.* 1951); *Gibson v. Pennsylvania R. R.*, 14 *N. J. Super.* 425, 434 (*App. Div.* 1951); *New Jersey Highway Authority v. Johnson*, 35 *N. J. Super.* 203, 214 (*App. Div.* 1955); *State ex rel. State Highway Com'r v. Gorga*, 54 *N. J. Super.* 520, 525 (*App. Div.* 1959).

Plaintiff further contends that the trial court's charge prevented the jury from finding the railroad negligent in the manner in which the train was operated, specifically in that the brakes were not applied as quickly as they should have been when the operators of the train discovered that a collision was imminent. Even assuming that the charge did have this effect, however, we find that no error was committed, for the record contains no evidence from which

a jury properly could find that the train was operated negligently.

Upon discovering that a collision with a traveler at a crossing could occur, the operator of a locomotive is required to exercise reasonable care under the circumstances to prevent the collision, and this standard of care includes the duty to endeavor promptly to bring the train to a halt if it appears that such action is necessary. *Jelinek v. Sotak,* 9 *N. J.* 19 (1952); *Taylor v. Lehigh Valley R. R.,* 87 *N. J. L.* 673 (*E. & A.* 1915); *Rafferty v. Erie R. R.,* 66 *N. J. L.* 444 (*Sup. Ct.* 1901); *Telfer v. Northern R. R. Co.,* 30 *N. J. L.* 188 (*Sup. Ct.* 1862). The testimony of the fireman indicates that he took immediate steps to halt the train when he discerned that the Bill car would not stop before traversing the crossing. The law requires no additional measures in such circumstances. *Jelinek v. Sotak, supra.* There was testimony by the engineer which suggests that the train's brakes were not applied until the train was practically upon the crossing. But at the speed at which the train was traveling (which is admitted not to have been wrongful in itself) a few seconds' time is translatable into many feet that the train would have covered. And the engineer testified that some seconds would elapse between the time that the brakes were operated and that their action was felt. Moreover, the engineer was not in position to see the automobile until it was hit, and thus it cannot be said from the engineer's testimony that the fireman did not respond with prompt action once the possibility of a collision became apparent.

The judgment entered in the Superior Court, Law Division, in favor of the defendant Central Railroad and against the plaintiff is affirmed. Ordinarily a judgment for costs would be awarded to the prevailing party, the defendant herein; but, in this case, since the plaintiff has succeeded in establishing a new measure of care, each party will bear its own costs.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.