272 N.J. Super. 68 (1994)
639 A.2d 352
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
FRANK MILLETT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 4, 1993.
Decided March 31, 1994.
*74 Before Judges KING, HAVEY and A.M. STEIN.
Mordecai Garelick, Assistant Deputy Public Defender, argued the cause for appellant (Zulima V. Farber, Public Defender of New Jersey, attorney; Mr. Garelick, on the brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Fred DeVesa, Acting Attorney General of New Jersey, attorney; Arthur S. Safir, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by KING, P.J.A.D.

I
Defendant appeals from convictions for armed robbery and purposeful or knowing murder. The charges stemmed from the killing of Anthony Mazzo, co-owner of a gas station in Pleasantville, on March 21, 1986. We conclude that the convictions must be reversed and we remand for a new trial. Irrelevant and unduly prejudicial evidence was admitted purporting to demonstrate defendant's consciousness of guilt. We also conclude that the trial prosecutor acted improperly by using a strategy designed to circumvent, in part, a pre-trial ruling barring the State from introducing evidence that defendant later committed a violent crime in Pennsylvania. The prosecutor urged the jury to draw an inference which he knew was false and which defendant could not rebut without revealing his commission of the later crime to the jury. This deprived defendant of a fair trial. The jury instruction on passion/provocation manslaughter was also in error.

*75 II
In late 1985, Frank Millett (defendant) and his family moved from Alaska to Havertown, Pennsylvania, a Philadelphia suburb. He worked as a chimney sweep. In February 1986, defendant started a second job with Med Labs of Delaware as a phlebotomist. This involved travel to nursing homes to draw blood from patients for laboratory analysis.
Phillip Blank, defendant's elderly next door neighbor, was aware that the Millett family was having financial difficulties and was "kind of strapped." They had sold their furniture in Alaska. Blank also knew that defendant's job required him to travel. Once, he had lent defendant his Sunoco credit card to buy gasoline. Defendant returned the card that same evening, and later paid Blank in cash for the amount charged.
On Friday, March 14, 1986, Blank gave defendant's wife his Amoco credit card which Blank himself had never used. Blank told her that, until defendant got paid, defendant could use the card to buy gas to get to and from work. Blank never intended to give the Amoco card to defendant to use permanently, and had no reason to believe that defendant would be leaving the area.
On the same day, Med Labs Vice President Judy Knotts terminated defendant's employment. Defendant had picked up his last paycheck at the main Med Labs office in Wilmington the day before. On Monday, March 17, defendant's wife told Blank that defendant had left home, and that she did not know where he was. Blank then phoned Amoco and requested cancellation of the credit card. In response to the question whether the card was lost or stolen, he told the Amoco representative the card was stolen.
On this same date, a man registering under defendant's name checked into the Star Motel in West Atlantic City. He gave his home address as Anchorage, Alaska. This man checked out on March 19, leaving a handbag and a beeper belonging to Med Labs. *76 The motel manager was unable to identify defendant as the person who stayed at the motel.
George Mazzo (George) was the co-owner of Triangle Amoco Service Station in Pleasantville. On March 21, 1986, at 1:30 p.m., he received a telephone call from defendant whose car was disabled on the Garden State Parkway and needed a new battery. George drove to the location and installed a new battery. Defendant produced Blank's Amoco credit card but did not disclose that he was not Phillip Blank. George took the credit card and instructed defendant to follow him to the service station to process the credit card transaction. The two arrived at the station at about 2:30 p.m. Anthony Mazzo (Anthony), George's brother, was at the station when they arrived. George made an in-court identification of defendant at trial.
George filled out a charge receipt in the amount of $90 and phoned Amoco for credit approval. He was told by Amoco that the sale was rejected and to confiscate the card. George bent the card in half but did not break it. Defendant was told that the card was rejected and that payment would have to be in cash. Defendant said he would call his parents in Margate for money and went to a public telephone down the street. When he returned, he told George that his parents would arrive shortly with cash. Defendant looked angry, and spent the afternoon in and around his car smoking cigarettes, seeming impatient. Meanwhile, defendant's credit card and sales slip remained in the service station office.
At about 5:15 p.m., George prepared to leave the service station for the day. He told Anthony that defendant was to pay in cash only for the battery since his credit card was rejected. He gave Anthony $40 in cash to finish the day's business, which normally ended at 7 p.m., and took the rest of the money from the cash register with him. George left after telling defendant that Anthony would take care of his transaction. At home, George asked his mother to call Anthony in the morning to wake him for work.
The next morning, March 22, George's mother called to tell him that Anthony had not returned home the night before and that *77 there was no answer at the service station. Shortly after 8 a.m., George discovered Anthony lying on the service station office floor. He immediately summoned the police. George later told the police that an iron breaker bar was missing from the service station. A breaker bar resembles a heavy ratchet and is used to break large bolts and nuts.
Joseph Helfrich, an identification officer with the Atlantic County Sheriff's office, arrived at the scene at 9:50 a.m. He took photographs of the office, the position and condition of the body, and an envelope lying at the foot of the body. There was no blood underneath the envelope. There were spots of blood on it. The envelope contained two State Farm automobile insurance identification cards; a paycheck stub in defendant's name from Med Labs; an auto tags receipt dated March 14, 1986, made out to defendant; the rear page of a car owner's manual; and an envelope from the Pennsylvania Department of Transportation.
The victim's pockets were pulled out. The drawers of the cash register were pulled from the register and scattered on the floor. The victim's head could have hit a cabinet as he fell to the floor in the cramped service station office. Some fingerprints were taken from the scene which did not match defendant's or the victim's fingerprints. Samples of hair and blood taken from the scene did not match defendant.
Blotches of blood in one photograph were identified by Helfrich as partial shoeprints resulting from the victim's blood having been tracked around the body on the floor of the service station. Helfrich did not know if the shoeprints resulted from contamination of the scene by police officers or others, or whether it was made by the perpetrator.
Dr. Donald Jason, a forensic pathologist, arrived at the scene at 10:15 a.m. He observed a pool of blood around the victim's head. Interpreting this information and a later examination of the body, he determined that the victim had been struck and died in the area where he was found, between 5:30 p.m. and 11:40 p.m. on March 21. After an autopsy, he also determined that death was *78 caused by ten blunt-force injuries to the head which resulted in skull fractures and contusions of the brain. The object used was a heavy item, cylindrical in shape, such as a tube-shaped piece of metal. It could have been a large wrench, pipe, or breaker bar. The first wound inflicted alone was capable of causing death. Each of the wounds was potentially the cause of death.
Investigator Thomas Prendergast of the Atlantic County Prosecutor's Office, Homicide Unit, was assigned the task of locating defendant and his vehicle. On March 23, 1986, the Amoco credit card belonging to Blank was used at the Cobbs Creek Amoco station in Philadelphia. On March 28, 1986, an individual purchased defendant's car from a used car dealer in Philadelphia.
On April 1, 1986, defendant encountered John Forgione outside Forgione's home in Lansdowne, Pennsylvania. Forgione first met defendant in December 1985 when defendant cleaned and repaired his chimney. Defendant asked if he could stop at Forgione's house and finish the chimney repair job which he had started in December. The two agreed that defendant would return the next day.
On April 2, 1986, defendant arrived at the Forgione residence as planned and worked on the chimney. He then assaulted Forgione and left him bound. After the assault Forgione discovered that articles of his clothing were missing. These included a pair of black patent-leather shoes, a pair of pants, socks, underwear, and a shirt. Forgione's wallet was also missing. Defendant's clothing, including his shoes and pants, were left in Forgione's house. The police later analyzed defendant's clothing and shoes. No link was found between these items and the murder of Anthony Mazzo.
Forgione told Lansdowne Police Sergeant Robert O'Donnell about the incident that had taken place at his home and provided a description of the missing clothing. When O'Donnell searched Forgione's home, he found clothing, shoes, and a wallet that did not belong to Forgione. The wallet contained the business card of Tommy Moore (Forgione's stage name), defendant's identification papers, a business card from Mazzo's Triangle Amoco Service *79 Station in Pleasantville, and a temporary registration transfer card for a Pennsylvania vehicle, dated March 14, 1986, requesting that the vehicle be registered in Alaska.
O'Donnell was aware of the Atlantic County authorities' efforts to locate and apprehend defendant, who was believed to be in the Lansdowne area. Upon learning of the Forgione incident, O'Donnell coordinated with Investigator Prendergast and actively participated in the effort to apprehend defendant.
O'Donnell arrested defendant on April 6, 1986, in Yeadon, Pennsylvania. He was wearing Forgione's missing clothing when apprehended. Hair, blood and saliva samples taken from defendant and from the contents of his car provided no link to the Mazzo murder scene.
John Gannon was serving a lengthy sentence for burglary in Delaware County Prison, Pennsylvania, when he met defendant in that facility in May 1986 after his arrest. Gannon testified that in June 1986, as he was sweeping outside defendant's cell, defendant started a conversation about why each of them was in prison. Defendant recounted to Gannon the events leading to the death of Anthony Mazzo. Defendant's version was the same as George Mazzo's until the point when George left the service station. Defendant told Gannon that sometime after George left, he attempted to retrieve the Amoco credit card and paperwork from the office. An argument ensued with Anthony, during which Anthony pulled defendant's hair. Defendant then grabbed "a brick or pipe" from a nearby table and struck Anthony on the head numerous times. He then picked Anthony up off the floor, placed his body against the desk, and felt pieces of skull and brain matter in his hands. Defendant grabbed some of his papers off the floor and the car keys, and ran out of the gas station. As he was doing this, he said that he stepped in a puddle of blood on the floor. Defendant took the murder weapon with him because of fingerprints. As he ran from the gas station, he saw a car parked across the street, with two "Black males" inside.
*80 A few days later, Gannon telephoned the Criminal Investigation Division of Delaware County and reported his conversation with defendant to an investigator. He later gave a formal written statement. Gannon thought defendant was disturbed since it was not necessary to hit someone numerous times over the head to knock them out. Gannon stated that he was motivated to inform on defendant because he felt bitter towards him for unnecessarily hurting someone. Gannon claimed that though he had committed many crimes, he had never done anything violent.
Gannon denied that anyone connected with law enforcement had ever told him anything regarding the circumstances or details surrounding the murder of Anthony Mazzo. He also denied that he obtained, or expected to obtain, benefits in jail as a result of informing on defendant. Gannon denied that he worked for or regularly reported to the warden.
Defendant did not testify at trial. He presented four witnesses who testified regarding Gannon's credibility. Terrance McCracken and Alonzo Watts testified that Gannon had obtained privileges, including good jobs that were inconsistent with his level of seniority. They believed Gannon's privileges were linked to his status as a "snitch." Watts believed that no inmate in the jail would speak to Gannon because they knew he was a "snitch."
Frank Cruiess, who had known Gannon for twenty years, testified that Gannon was willing to inform on others for his own benefit. Gannon once asked Cruiess if he knew anything about defendant's case and appeared to be "fishing" for information.
Thomas Thompson testified that he had been questioned by the police about an unrelated homicide shortly after Gannon had approached him and asked questions about that case. Thompson believed that Gannon falsely implicated him in the homicide for Gannon's own benefit. He also had seen Gannon trying to talk to defendant, who on one occasion told Gannon to "get the f____ away from me."

*81 III
On August 6, 1987, an Atlantic County grand jury returned an indictment which charged defendant with credit card theft, contrary to N.J.S.A. 2C:21-6(c)(1) (count one); credit card fraud, contrary to N.J.S.A. 2C:21-6(d)(1) and (2) (counts two and three); armed robbery, contrary to N.J.S.A. 2C:15-1 (count four); felony murder, contrary to N.J.S.A. 2C:11-3(a)(3) (count five); and purposeful or knowing capital murder, contrary to N.J.S.A. 2C:11-3(a)(1) and (2) (count six).
On the prosecutor's pre-trial motion, counts one and three of the indictment were dismissed; the remaining counts were renumbered in sequence as counts one through four. On February 2 the judge denied defendant's motion to dismiss the indictment for violation of the Interstate Agreement on Detainers (IAD).
The jury trial began on April 16, 1990. At the close of the State's case, the judge entered a judgment of acquittal on the credit card fraud count. On April 27, 1990, the jury found defendant guilty of armed robbery and purposeful or knowing murder, but not capital murder. No finding was returned by the jury with respect to felony murder.
On the murder conviction, defendant was sentenced to life imprisonment, with a thirty-year parole ineligibility period. This sentence was imposed consecutively to the term of imprisonment defendant was then serving in Pennsylvania. On the armed robbery conviction, defendant was sentenced to a twenty-year term of imprisonment, with a ten-year parole ineligibility period. This term was imposed consecutively to both the sentence imposed on the murder conviction and the sentence in Pennsylvania. The judgment of conviction, entered on June 22, 1990, erroneously stated that defendant was found guilty of felony murder and purported to merge this "conviction" into the armed robbery conviction.

*82 IV
On this appeal, defendant raises these nine points:
1. DID THE TRIAL COURT ERR IN RULING THAT THE TESTIMONY OF STATE WITNESSES JOHN FORGIONE AND ROBERT O'DONNELL WAS ADMISSIBLE AT TRIAL, AND DID THE PROSECUTOR ACT IMPROPERLY BY URGING THE JURY TO DRAW AN INFERENCE WHICH HE KNEW TO BE FALSE.
2. DID THE JUDGE ERR IN FAILING TO PROPERLY INSTRUCT THE JURY ON PASSION/PROVOCATION MANSLAUGHTER (raised as plain error).
3. SHOULD THE JUDGMENT OF CONVICTION WHICH STATES THAT DEFENDANT WAS FOUND GUILTY OF FELONY MURDER BE CORRECTED BECAUSE THE JURY DID NOT RENDER A VERDICT ON THAT COUNT (raised as plain error).
4. DID THE JUDGE ISSUE AN ERRONEOUS CHARGE ON ROBBERY AND FELONY MURDER AND DID HE ALSO ERR BY FAILING TO INSTRUCT THE JURY ON THEFT AS A LESSER INCLUDED OFFENSE OF ROBBERY (raised as plain error).
5. DID THE TRIAL COURT ERR IN FAILING TO DISMISS THE INDICTMENT PURSUANT TO THE INTERSTATE AGREEMENT ON DETAINERS.
6. DID THE STATE'S INTRODUCTION OF EVIDENCE REGARDING DEFENDANT'S FINANCIAL CONDITION, AND THE PROSECUTOR'S SUGGESTION THAT DEFENDANT HAD A FINANCIAL MOTIVE FOR COMMITTING THE OFFENSE, DEPRIVE DEFENDANT OF A FAIR TRIAL (raised as plain error).
7. DID THE PROSECUTOR IMPROPERLY VOUCH FOR THE CREDIBILITY OF THE STATE'S WITNESSES DURING SUMMATION (raised as plain error).
8. DID THE TRIAL COURT VIOLATE DEFENDANT'S RIGHT TO A FAIR TRIAL BY DENYING HIS APPLICATION TO PRESENT EXCULPATORY EVIDENCE.
9. DID THE JUDGE ERR IN SENTENCING DEFENDANT TO CONSECUTIVE RATHER THAN CONCURRENT TERMS OF IMPRISONMENT.

V
Defendant contends that the judge erred by allowing Forgione and O'Donnell to testify about defendant's "clothing switch" at Forgione's house in Lansdowne, Pennsylvania about two weeks after the murder of Anthony Mazzo. He claims that this evidence *83 was not probative of his consciousness of guilt for the Mazzo murder and was unduly prejudicial.
Defendant was convicted of two crimes in Pennsylvania. He committed both crimes after the March 21, 1986, Mazzo homicide: the murder of an elderly woman on March 24, 1986, and the aggravated assault on Forgione on April 2, 1986. In the latter criminal episode, defendant beat Forgione severely enough to bloody his own clothes. Defendant received lengthy prison terms in Pennsylvania for those two offenses.
The prosecutor sought to introduce evidence of both crimes during the State's case-in-chief to demonstrate defendant's intent and state of mind at the time of the Mazzo homicide. In a pre-trial ruling, the judge concluded that under Evid.R. 55 (N.J.R.E. 404(b)), testimony concerning these "other crimes" was inadmissible.
Just before the start of trial, the prosecutor requested that Forgione be allowed to testify to a "sanitized version," i.e., that defendant exchanged his clothing and shoes for Forgione's while he was at the Forgione residence on April 2. The State's theory was that defendant's presence in Landsdowne in the Philadelphia area was evidence of flight or avoidance of detection of the Mazzo murder. The State claimed that his change of shoes and clothing at Forgione's Landsdowne home several weeks after the Mazzo homicide showed consciousness of guilt: he was shedding his clothing, especially his shoes, to avoid detection by the police for Mazzo's murder and to discard potentially incriminating evidence. A partial footprint was found at the scene of the Mazzo crime. The prosecutor intended to produce a witness, Gannon, who would testify that defendant said that he had stepped in Mazzo's blood. Also, defendant's wallet, which was left behind at the Forgione residence, contained a business card from Mazzo's Amoco Service Station in Pleasantville. The prosecutor argued that he needed to produce Forgione to introduce this wallet and the enclosed business card which linked defendant to the scene of the crime. At trial, defense counsel offered to stipulate that defendant's wallet, *84 when found at Forgione's home, contained the Amoco business card. The judge refused to accept this offer as a possible solution.
Defense counsel opposed the "clothing switch" evidentiary application, arguing that this proof would violate the earlier Evid.R. 55 (N.J.R.E. 404(b)) ruling prohibiting the State from introducing evidence of the "other crimes" committed in Pennsylvania. Counsel also argued that under Evid.R. 4 (N.J.R.E. 403) principles, evidence of defendant's clothing switch was not sufficiently relevant to the Mazzo murder and should be excluded. Defendant's bloody clothing left at Forgione's was analyzed and there was no match to the Mazzo crime scene in New Jersey. Likewise, there was no evidence produced to show that the shoeprint at the Mazzo crime scene matched defendant's shoes recovered at the Forgione residence. Referring to the assault on Forgione, defense counsel stated the obvious: "[t]he man went to change the shoes and clothes at the Forgione residence because of what happened there. They're a bloody mess."
In his pre-trial ruling, the judge concluded that the probative value of defendant's exchange of clothing and shoes "may not be great, [h]owever, it's relevant.... A person doesn't redress himself. Doesn't take his clothes off and his shoes off for no apparent reason. That should be able to be argued to the jury." The judge reserved decision as to whether this evidence was sufficient to warrant a charge on flight.
From the beginning of trial, the State argued the significance of the clothing exchange. In his opening statement, the prosecutor invited the jury to draw an adverse inference from this unexplained and "mysterious" behavior:
Forgione under very unusual circumstances trusts him and allows him to come into his house and look at the chimney ... and by the end of that visit, would you believe this, Forgione has lost his shoes and his clothes.
Now, you're saying to me, what do you mean by that, Prosecutor? Well, this is what I'm telling you. That for some reason [defendant] wanted to exchange his shoes and his clothes with Forgione.
... What I am telling you is that for some mysterious reason this person, [defendant], on this day is going around trying to change shoes with people. Does *85 that not tell you that he has a consciousness in his mind of what he did, of where he may have stepped, of what might happen to him if those shoes are ever recovered by the police....
All right, now, you're going to say to me, Prosecutor, that sounds incredible and explain to me why [defendant] would do that? I have no explanation other than what I just told you and that's what I'm going to present to you and it will be up to you people to use your common sense and under all this situation and come to the conclusion of why he would do that.

[Emphasis added].
Before Forgione took the stand, defense counsel again argued that his testimony should be excluded. In particular, counsel opposed the prosecutor's plan to introduce the blood-encrusted pants and the shoes left behind by defendant at Forgione's into evidence, arguing that these items had not been shown to have any connection to the Mazzo killing. In responding to the objection, the prosecutor framed the issue as "why this individual, days after this event, is going around switching shoes with people.... [A]nd it's a legitimate question to ask and I see no reason why I can't ask the question." Defense counsel responded:
That's exactly why we can't answer it because it's obvious why he changed his pants and his shoes. Because he did not want to walk out of Forgione's residence with those shoes and pants with Forgione's blood all over him and walk into the streets of our neighborhood around Forgione's house. He wanted to get rid of the clothes. That's flight from the Forgione crime, which has nothing at all to do with this crime we're talking about today.... He's not trying to escape from this crime.... He was escaping the Forgione residence and that's why he changed his clothes. We can't answer that, Your Honor, without bringing up the matter of that incident, which has been precluded by Rule 55 [N.J.R.E. 404(b)] and it is essentially there for the protection of defendant.
The judge nonetheless permitted testimony that defendant changed shoes and clothes at Forgione's but ruled that the blood-encrusted pants could not be admitted into evidence or shown to the jury. With respect to the shoes, the judge ruled that under an Evid.R. 4 (N.J.R.E. 403) analysis, their admission was not unduly prejudicial since there was no blood on them. The judge also reasoned that in the absence of blood, it could reasonably be inferred that defendant exchanged the shoes for another reason, i.e., to get rid of incriminating evidence. Or, the judge observed, *86 defense counsel could argue that "quite the contrary [defendant] took these shoes for some other reasons and one obvious reason is that they're in such deplorable condition. That's the obvious reason and he took newer shoes." The judge also agreed to issue a cautionary instruction that the jury was not to consider the clothing exchange as evidence of a theft or any other criminal offense.
In keeping with the judge's ruling, Forgione made no mention that he was assaulted by defendant. He testified that after defendant's departure, he discovered that a pair of pants containing his wallet, and a pair of his shoes were missing. Additionally, defendant left his own clothes and shoes behind. Immediately after Forgione's testimony, the judge instructed the jury that "at this juncture ... you are not to take into consideration that it was a theft of any kind because that is not the reason I permitted the clothing to be testified to."
Sergeant O'Donnell testified that when he arrested defendant, he was wearing the clothes that were missing from Forgione's house. He also testified that when he searched Forgione's house, he found clothing and a wallet that did not belong to Forgione. The wallet contained a business card from the Mazzo's Amoco service station in Pleasantville.
Immediately after O'Donnell's testimony, the judge issued the following limiting instruction:
You are not to consider the clothing, the shoes, the wallet that there was a theft. I permitted it only for the purpose to show that the defendant ... was in the Lansdowne-Media area at or about the time that was testified to and only for that purpose. That he changed clothes and that he was apprehended by Sergeant O'Donnell with these clothes on and with the wallet of Forgione. You are not to consider that for any theft or any of that business that's not material to this case. It's not relevant and you are to disregard it for that reason and the only reason you'll use it [is] to show that he was there at that time and place and that's it.
During summation, the prosecutor again urged that the only reasonable inference from the evidence was that defendant exchanged clothes at the Forgione residence because of his desire to *87 evade apprehension for the Mazzo murder. His comments included the following:
Now, talk about a reasonable doubt, is there anyone of you who could even in the furthest stretch of your imagination dream up a reason why [defendant] would go to Forgione's house in Lansdowne, Pennsylvania.

........
... [It w]ould be worth a try ... [to get Blank to lend defendant some money] rather than to be scurrying around in this whole area for like a week and a half going to people's houses, doing the things he was doing, with the shoes [and] with the clothes. Does that sound to you like what [defense counsel] calls innocent behavior? ...
... I'm asking you to analyze all this and say, you know, prosecutor, that makes all the sense in the world to me and beyond a reasonable doubt I can't even think of a reason why he would be messing around with these shoes, changing shoes ... and he's got Mr. Forgione's clothes and his wallet.

Now, what else can we learn from this behavior? One, I suggest to you its the behavior of a guilty person, that there's no way you can analyze these facts and come to the conclusion that he's just acting like an innocent guy....
[Emphasis added].
At sidebar, defense counsel objected to the summation comments, stating "everybody ... in this courtroom who knew about the fact of what happened in Philadelphia at Mr. Forgione's house knows why the clothes were changed and yet the obvious inference was for something else. There is no way for me to refute it in the trial or in the closing...."
There was no further instruction on the permissible use of the Forgione and O'Donnell testimony in the judge's final charge to the jury at the end of trial. No flight instruction was given in the final charge because the judge concluded that the evidence did not warrant such an instruction. See State v. Sullivan, 43 N.J. 209, 238-39, 203 A.2d 177 (1964), cert. denied, 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966) (departure from the scene of a crime takes on the legal significance of flight only when "circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt").
*88 Generally, conduct after the commission of a crime which indicates consciousness of guilt, or actions inconsistent with innocence, is admissible in evidence. State v. Rechtschaffer, 70 N.J. 395, 413, 360 A.2d 362 (1976). Under the facts of this case, we agree with defendant that evidence of the shoe and clothing exchange should have been excluded. The slight relevance did not overcome the undue prejudice.
Relevant evidence is "evidence having any tendency in reason to prove any material fact." Evid.R. 1(2) (N.J.R.E. 401). When considering the relevancy of evidence, the inquiry should focus on "whether the [evidence offered] `renders the desired inference more probable than it would be without the evidence.'" State v. Davis, 96 N.J. 611, 619, 477 A.2d 308 (1984) (quoting State v. Deatore, 70 N.J. 100, 106, 358 A.2d 163 (1976)). Probative value has been defined as "the tendency of evidence to establish the proposition that it is offered to prove." State v. Hutchins, 241 N.J. Super. 353, 359, 575 A.2d 35 (App.Div. 1990).
The State offered no proof that the shoes and clothing left at the Forgione residence about two weeks after the homicide were worn by defendant on the date of the homicide. Nor did the State establish any scientific connection between the discarded shoes and clothes at Forgione's house and the Mazzo murder. The blood on the clothing was not Mazzo's blood; the shoes could not be tied into the shoeprint left at the Mazzo crime scene. Defendant had not told Gannon, the jail house informant, that he later exchanged shoes or clothing at Forgione's in order to evade apprehension or to avoid suspicion for the Mazzo homicide. Rather, defendant allegedly told Gannon that he "stepped in a puddle of blood" at the crime scene.
Without any substantial nexus to the Mazzo homicide, this evidence did not have the tendency to "establish the proposition it was offered to prove," i.e., that defendant wanted to rid himself of these items because they could connect him to Mazzo's homicide. Nor did defendant's conduct necessarily render the desired inference "more probable than it would be without the evidence." We *89 agree that the clothing and shoe exchange looked like behavior which indicated consciousness of guilt, but it clearly appears that defendant's conduct was extremely relevant to his consciousness of guilt for the Forgione assault which he had just committed and for which he later was convicted, rather than the Mazzo homicide which occurred about two weeks earlier.
But, conceding some slight relevance to the exchange of shoes, predicated on Gannon's testimony that defendant was aware that he stepped in the victim's blood, and notwithstanding the temporal gap and lack of forensic connection, this slight relevance was substantially outweighed by the potential for prejudice, misleading of the jury, and confusion of the issues, especially since nothing about the shoes matched the Mazzo crime scene. See Evid.R. 4 (N.J.R.E. 403). We also observe that the prosecutor did not confine the testimony or his comments to shoes alone, but argued that the clothing exchange was also relevant to defendant's consciousness of guilt of the Mazzo homicide.
We also are troubled by the prosecutor's conduct, which we believe was improper. The prosecutor tried to circumvent the judge's Evid.R. 55 (N.J.R.E. 404(b)) ruling precluding evidence of defendant's "other crimes" by arguing an inference that he knew was not supported by the facts and which defendant could not rebut without revealing to the jury his criminal assault on Forgione. The prosecutor's repeated suggestion that the clothing exchange was "bizarre" and "mysterious" behavior, ostensibly having no rational explanation other than defendant's desire to avoid apprehension for the Mazzo homicide, was disingenuous, if not deliberately deceptive.
As the prosecutor was aware, there was a very logical and reasonable explanation for defendant's behavior which had nothing to do with the Mazzo incident. Defendant had bludgeoned Forgione and bloodied his own clothing in the process. In light of this information, known to everyone but the jury, the desire to exchange clothes was not so unreasonable or suspect as to cast an inference of guilt for the Mazzo homicide. Defendant would *90 hardly want to "announce" his assault on Forgione by walking the streets in blood-spattered clothing.
"`The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done.'" Jackson v. Wainwright, 390 F.2d 288, 294 (5th Cir.1968) (quoting Canon 5 of the American Bar Association Canons of Professional Ethics). In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the federal Supreme Court described the delicate balance inherent in the task of a prosecutor. Although he can pursue a conviction with "earnestness and vigor," and "may strike hard blows, he is not at liberty to strike foul ones." 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321.
Moreover, "[i]t is not only affirmative misrepresentations which the prosecutor is prohibited from employing to secure a conviction; omissions and half truths are equally damaging and prohibited, and their use is no less culpable." Imbler v. Craven, 298 F. Supp. 795, 806 (D.C.Cal. 1969), aff'd, 424 F.2d 631 (9th Cir.), cert. denied, 400 U.S. 865, 91 S.Ct. 100, 27 L.Ed.2d 104 (1970). For example, in Imbler, the court reversed defendant's conviction where the prosecutor led his witness to state his commitment to a mental hospital had been voluntary, when in fact the prosecutor knew the true facts were to the contrary. 298 F. Supp. at 806.
Admittedly, the case before us does not present a clear-cut situation. Forgione did not testify falsely, and the jury might possibly have drawn only the permissible but very tenuous inference suggested by the prosecutor, based on the limited facts before it, that this "clothing exchange" somehow ineluctably evinced consciousness of guilt for the Mazzo homicide. However, our ultimate impression on this record is that the prosecutor deliberately left the jury with a false impression: that there was no other rational explanation for defendant's switch of clothes and shoes at the Forgione residence except escaping the Mazzo murder. The prosecutor, in fact, went so far as to represent to the jury that he personally knew of no other explanation.
*91 Moreover, we conclude on this record that this strategy was deliberately employed to circumvent the judge's prior ruling excluding introduction of "other crimes" evidence. The prosecutor was aware that the false inference he encouraged could not be rebutted by defendant without apprising the jury of the Forgione assault, evidence which the judge properly excluded under Evid.R. 55 (N.J.R.E. 404(b)). During the argument on post-trial motions, the prosecutor acknowledged that this was his intention and stated that it was not inappropriate to put defendant in that position. Defendant was left with the choice of allowing the prejudicial inference to stand unchallenged, or of rebutting the inference by revealing his commission of the other crime, either personally or through cross-examination by his counsel, an option which would also unduly prejudice him. We find this circumvention of the Evid.R. 55 (N.J.R.E. 404(b)) ruling inherently unfair to defendant and violative of his right to a fair trial. Cf. State v. Eason, 138 N.J. Super. 249, 258, 350 A.2d 506 (App.Div. 1975) (reversible error for prosecutor to attempt to circumvent Evid.R. 55 (N.J.R.E. 404(b)) ruling).
When this issue was raised in post-trial motions, the judge expressed his view that the "clothing exchange" evidence "was such an insignificant, infinitesimal part of the entire case that it certainly had no capacity to prejudice anything." We disagree with this characterization. The prosecutor's references were repeated. In both his opening and closing statements, he urged the jury to view the clothing switch as evidence indicative of defendant's consciousness of guilt.
The State's evidence of guilt was not so overwhelming that we can deem the error harmless. R. 2:10-2. The State's case was based on circumstantial evidence, buttressed by the testimony of an alleged professional jailhouse informant. There were no eyewitnesses. No scientific or physical evidence linked defendant to the murder itself. Under the circumstances, we conclude that the prosecutor's persistent emphasis on the clothing exchange at Forgione's as evidence of defendant's consciousness of guilt was *92 significant, prejudicial, and could have led to a result which the jury might not otherwise have reached on this evidence.
The evidence of the clothing exchange at the Forgione residence should have been excluded on Evid.R. 4 (N.J.R.E. 403) grounds. The evidence had slight relevancy only and a substantial capacity for undue prejudice; its admission was inconsistent with and effectively neutralized the Evid.R. 55 exclusionary ruling. The prosecutor acted improperly by urging the jury to draw an inference that he knew was not supported by the facts and also knew defendant could not rebut without forfeiting the benefit of the judge's prior and proper exclusionary Evid.R. 55 (N.J.R.E. 404(b)) ruling. Since this error had the capacity to deprive defendant of a fair trial, we reverse.
[VI on the erroneous jury instruction on passion/provocation manslaughter has been redacted for publication purposes. See State v. Coyle, 119 N.J. 194, 574 A.2d 951 (1990), for summary of pertinent principles.]

VII
Defendant also contends that the jury did not render a verdict on count three of the amended indictment, which charged him with felony murder. This claim is nominally accurate. Although the judgment of conviction indicates a verdict of guilty with respect to felony murder, the trial transcript does not reflect that such a verdict was actually announced in open court. Moreover, the jury verdict form shows that the jury made no finding of guilt as to the felony murder count. The judgment of conviction does note that the felony murder count (count three) was purportedly "merged" at sentencing into the robbery count (count two).
The following exchange took place at the verdict stage:
THE COURT: All right, ladies and gentlemen of the jury, have you reached a verdict.
THE FOREMAN: Yes.
THE COURT: Mr. Foreman, would you hand your verdict to the clerk, please, and she will hand it to me. All right, in the case of State of New Jersey versus Frank *93 Millett, the second count, robbery, guilty, and the answer to the armed or not armed was armed. In the fourth count, the A section, not guilty, the B section, by his own conduct the defendant did purposely or knowingly cause serious bodily injury that resulted in the death of Anthony Mazzo, meant or intended to cause serious bodily injury not death, guilty. The others, D and E, have not been answered. Miss Clay, would you poll the jury please?
The jurors were asked to answer "yes" if they voted for the verdict as stated by the judge. Each juror responded with a "yes."[1] *94
*95 The primary purpose of polling the jury is to determine whether there is unanimous concurrence in the verdict rendered by the foreman. State v. Vaszorich, 13 N.J. 99, 126, 98 A.2d 299, cert. denied, 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1953). "`The practice of long standing requires each juror to answer for himself, thus creating individual responsibility, eliminating any uncertainty as to the verdict announced by the foreman.'" Ibid. (quoting State v. Cleveland, 6 N.J. 316, 322, 78 A.2d 560 (1951)).
*96 Since the jury made no finding as to defendant's guilt or innocence with respect to felony murder here, such a finding cannot be presumed. Cf. State v. Cleveland, supra, 6 N.J. at 323, 78 A.2d 560 (where jury returned a verdict of guilty without a finding as to the degree of murder committed, verdict was fatally defective and no judgment could be pronounced). Here, the jury verdict form and the oral record support defendant's contention that the jury made no finding of guilt respecting the felony murder count. State v. Pohlabel, 40 N.J. Super. 416, 423, 123 A.2d 391 (App.Div. 1956) (any conflict between judgment of conviction and oral record must be resolved in favor of the oral record).
The State argues that since defendant was convicted of armed robbery and murder (counts two and four), the felony murder conviction was surplusage. The cases cited by the State in support of this proposition are not precisely applicable, but stand for the proposition that where a defendant is convicted of both felony murder and purposeful murder, the felony murder verdict is surplusage. See, e.g., State v. Stenson, 174 N.J. Super. 402, 406-07, 416 A.2d 944 (Law Div. 1980), aff'd o.b., 188 N.J. Super. 361, 457 A.2d 841 (App.Div. 1982), certif. denied, 93 N.J. 268, 460 A.2d 671 (1983). Here, there was no express determination of guilt on felony murder. Since each count in an indictment is regarded as if it were a separate indictment, and a jury is free to render inconsistent verdicts, we cannot presume that a finding of guilt for armed robbery and murder necessarily meant a finding of guilt on felony murder. See State v. Dancyger, 29 N.J. 76, 92-93, 148 A.2d 155, cert. denied, 360 U.S. 903, 79 S.Ct. 1286, 3 L.Ed.2d 1255 (1959) (defendant guilty of larceny but not guilty of entering with intent to steal).
Defendant argues that under the circumstances, he is entitled to a judgment of acquittal on the felony murder count. We disagree. The jury did not return a verdict of "not guilty." The jury did return verdicts of guilty on armed robbery and murder  the essential and predicate crimes for felony murder in this context. Our reversal in this case for the reasons expressed *97 in V and VI is for trial error, not because the State failed to prove any element of its case. See Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The verdict as returned implies nothing as to defendant's innocence on the felony murder count. Indeed, the verdict as returned expressly indicates an accord as to defendant's guilt of felony murder.
In Burks v. United States, supra, the federal Supreme Court distinguished between reversal due to trial error and reversal based on acquittal for insufficient evidence. A reversal for trial error never constitutes a decision that the State failed to prove its case, and therefore implies nothing with respect to the defendant's guilt or innocence. Id. 437 U.S. at 15, 98 S.Ct. at 2149, 57 L.Ed.2d at 12.
Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished....
The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble. Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been submitted to the jury. Since we necessarily afford absolute finality to a jury's verdict of acquittal  no matter how erroneous its decision  it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.
[Id. at 437 U.S. at 16, 98 S.Ct. at 2150, 57 L.Ed.2d at 12-13 (citations omitted) (footnotes omitted).]
Our Supreme Court has expressly adopted the principles established in Burks, a federal prosecution, and its companion case involving state court proceedings, Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). See State v. Tropea, 78 N.J. 309, 316, 394 A.2d 355 (1978).
In the present context, because no verdict was returned specifically on the felony murder count, the jury was discharged without objection by defendant, and the robbery and murder *98 counts must be retried due to trial error, we see no impediment to retrial on the felony murder count. The procedural posture is quite the same as if a mistrial had been declared on the felony murder count for failure to reach a verdict. See State v. Devlin, 234 N.J. Super. 545, 552, 561 A.2d 280 (App.Div.), certif. denied, 117 N.J. 653, 569 A.2d 1348 (1989). Retrial on the felony murder count, combined with the necessary retrial on the armed robbery and general murder counts, imposes no untoward oppression on the defendant. There was surely no acquittal here and no failure of proof on the felony murder count, either. The prosecution for felony murder was never terminated in defendant's favor. We reject the claim of a bar of prosecution because of prior acquittal.

VIII
The next point raised by defendant is exclusion of evidence of possible guilt of third parties by the trial judge. He claims that exclusion of such potentially exculpatory evidence deprived him of a fair trial. A criminal defendant may present evidence that another may have committed the crime with which he was charged. State v. Sturdivant, 31 N.J. 165, 179, 155 A.2d 771 (1959), cert. denied, 362 U.S. 956, 80 S.Ct. 873, 4 L.Ed.2d 873 (1960). The standard for admitting such evidence is clear:
It would seem in principle to be sufficient if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.
....
We think it not enough to prove some hostile event and leave its connection with the case to mere conjecture. Somewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case. The question of relevancy ultimately rests in a sound exercise of discretion.
[Ibid.]
Accord State v. Koedatich, 112 N.J. 225, 297-99, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989); State v. Jorgensen, 241 N.J. Super. 345, 350, 575 A.2d 31 (App.Div.), certif. denied, 122 N.J. 386, 585 A.2d 389 (1990); State *99 v. Feldman, 254 N.J. Super. 754, 758, 604 A.2d 242 (Law Div. 1992). The issue is fact-sensitive. Adequate relevance will not be found unless there is some link between the evidence and the victim or the crime. Koedatich, supra, 112 N.J. at 299, 548 A.2d 939.
Prior to trial, defense counsel orally proffered testimony that an observer, Debeanette Shillingford, saw an African-American male with some type of mask over his face walking from the direction of the gas station between 8 and 8:30 on the night of the murder. The man walked past her sandwich shop and hurriedly left upon seeing that he had been observed. Defense counsel orally represented that Shillingford was later shown three photographs and identified a Kevin White as the person she observed that evening. White, who had a criminal record, was sought by the police for questioning in connection with the Mazzo homicide. Counsel stated that White had submitted to a polygraph test on March 22, 1986, the day after the homicide. He further represented that White was found deceptive when he stated that he had no knowledge that a man had been assaulted in the Mazzo gas station. Defense counsel had no affidavit or certification from Shillingford verifying her identification of White at the time the motion was argued. Defense counsel also contended that four "suspicious looking" Black males were sitting in a car directly across the street from the Mazzo gas station at or near the time of Anthony Mazzo's death.
The judge rejected defense counsel's application to present this evidence to the jury. He reasoned that:
Proof is testimony or an affidavit or a certification or something that brings a fact before the Court.... Now as far as I'm concerned, there is no question of third party guilt in this matter. We're talking about mere conjecture. All our cases indicate mere conjecture is not sufficient. Merely casting some suspicion on a third party should be excluded.... For example, not that I should take this into consideration, but the Shillingford thing, the person with the mask, at first blush, this appears that we have a, quote, robber; armed robbers wear masks. This man went right up to the sub shop window, looked in and then walked away, looked into the window that the Shillingford woman was in and walked away. Now, that's not the kind of evidence that would bring before a jury some third person's guilt. That's so speculative, so fraught with conjecture, so clearly a lack of a nexus, a lack of a link, a lack of anything connecting this person with the robbery, murder of the *100 gas station attendant, and can be only introduced to have the jury attempt to focus its attention upon this third person, this person who may have, could have, might have committed this offense because this unnamed person was in the general area.
The judge also ruled that evidence of four males sitting in a car across the street from the gas station near the time of the murder was far too speculative to admit as evidence of third-party guilt. Finally, the judge agreed to reconsider a "Koedatich-type" motion if he was presented with a detailed affidavit that did more than merely place another individual "in and about the general area of the offense." There is no indication in the record that such an affidavit was presented.
We disagree with the judge's ruling excluding the proffer of this evidence. We conclude that the proximity of time and place satisfies the relevance standard of Sturdivant, supra, 31 N.J. at 179, 155 A.2d 771, and Koedatich, supra, 112 N.J. at 297-99, 548 A.2d 939. The evidence, in order to be admissible, need not establish a probability of a third-party guilt. Id. at 299, 548 A.2d 939. There need only be proof capable of raising a reasonable doubt on the issue of defendant's guilt. Ibid.
We recognize that defense counsel made a rather specific representation and "spread on the record" what he hoped to prove about possible third-party guilt. The best technique is to make the offer of proof and preserve the record of excluded evidence in some more formal manner, either by testimony, if possible, or an affidavit or certification, or by preserving the proposed witness's written or adopted statement in the record by marking it for identification. See R. 1:7-3; Evid.R. 8(1) (N.J.E.R. 104(a)). The "proper ground work" for consideration of the question on appeal must be laid by counsel or the point can be forfeited on appeal. See Duffy v. Bill, 32 N.J. 278, 294, 160 A.2d 822 (1960); see also State v. Johnson, 46 N.J. 289, 291, 216 A.2d 392 (1966). The more specific and tangible the offer, the more likely appropriate preservation for appeal.

*101 IX
Finally, we conclude that the trial judge did not err in refusing to dismiss the indictment for violation of the Interstate Agreement on Detainers (IAD). Defendant was arrested in Pennsylvania in April 1986. He was brought to New Jersey to stand trial on the capital charge on January 14, 1988. On March 17, 1988, the IAD time period was tolled by mutual consent between counsel. On September 7, 1988, the tolling of the statute was continued by agreement until January 1989. Until that time, sixty-three days had elapsed.
On January 18, 1989, the jury selection process began. On January 23, the prosecutor advised defendant's attorneys that Manfred Eichman would be a witness for the State. Both of defendant's attorneys moved to withdraw from the case based on their prior representation of Eichman, which counsel believed presented a conflict of interest. A hearing was held on January 26 concerning the substance of Eichman's testimony, after which the judge denied defense counsels' joint motion for withdrawal. On appeal to this court, we reversed this ruling and counsel withdrew.
On February 10, 1986, new counsel were appointed. Their request for a continuance to prepare for trial was granted. On March 10, defendant's attorneys requested more time for further investigation and for the filing of pre-trial motions. This additional continuance was granted over the prosecutor's objection.
On March 31, the judge set a trial date for September 13, 1989, and ordered all motions to be filed by July 28, 1989. On July 31, defendant's attorneys discovered that a State witness, Harvey Gist, may have been represented by them at one time. Defense counsel requested time to investigate the matter. On August 18, defendant's attorneys moved to withdraw from the case based on their prior representation of Gist. The judge granted this motion.
On September 15, 1989, defendant's third and final pair of public defenders was assigned. Pre-trial hearings were held on September 21, October 13, and October 17. At the October 17 hearing, *102 the judge ruled that all motions must be filed by December 18, and that a jury would be empaneled on February 14, 1990. On December 14, the parties discovered that due to an oversight, no orders relating to pre-trial matters had been presented or signed. Once these orders were presented, counsel disagreed on their recollection on what the orders were supposed to express. On December 18, another hearing was held, where the parties determined that oral motions pertaining to the IAD issue could not be found in any of the transcripts.
On January 19, 1990, the judge set a trial date of March 28, 1990. On February 2, the judge denied defendant's motion to dismiss the indictment for failure to comply with the 120-day time limit contained in N.J.S.A. 2A:159A-4(c). The judge concluded that defendant was unable to stand trial within the meaning of N.J.S.A. 2A:159A-6(a) when he was without counsel and while new counsel prepared for trial, and that the time period had been effectively tolled.
In denying defendant's motion, the judge remarked upon the number of times the case was listed for hearings, and the fact that attorney conflicts prevented the case from proceeding. The judge explained that:
[D]uring all of the time, unquestionably in my mind, the statute was tolled because ... defendant was unable to proceed to trial for whatever reason, and I don't place the blame upon the prosecutor for setting forth that he was going to call either Manfred Eichman or Harvey Gist ... and merely because the .. . two sets of prior attorneys had represented the witnesses, there clearly existed the fact that this defendant, because of that, was unable to stand trial.
Now, I know both attorneys for the defendant have said that the delay was not created by the defendant. Now, that's not exactly correct. He could have proceeded to go forward with the trial and the matter would have been disposed of. I don't fault them for requesting, in the first instance, that he was ready to go to trial. However, by the same token, he also set forth that he did not want [the first set of attorneys] to represent him, and on the second instance, when Gist's name surfaced, saying ... I want a speedy trial, and I also don't want [the second set of attorneys] to represent me. That's why the matter was delayed ... [W]ithout having attorneys for this defendant, he was unable to stand trial.
Trial finally began on April 16, 1990.
The IAD spells out the circumstances under which one state may obtain temporary custody of another state's prisoner. The *103 express policy of the IAD, and the purpose of the agreement, is to "encourage the expeditious and orderly disposition of ... charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." N.J.S.A. 2A:159A-1; State v. Buhl, 269 N.J. Super. 344, 355-57, 635 A.2d 562 (App.Div.), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994); State v. Johnson, 269 N.J. Super. 276, 283, 635 A.2d 527 (App.Div. 1993), certif. denied, 136 N.J. 296, 642 A.2d 1005 (1994). Failure to comply with the 120-day requirement mandates dismissal of the indictment. State v. Chirra, 79 N.J. Super. 270, 275, 191 A.2d 308 (Law.Div. 1963).
One method by which a prisoner in another jurisdiction may be temporarily transferred to the custody of a receiving state is through the receiving state's invocation of Article IV of the agreement. N.J.S.A. 2A:159A-4; State v. Stiles, 233 N.J. Super. 299, 305, 558 A.2d 1333 (App.Div. 1989). Article IV, which was invoked here, provides among other things, that defendant is entitled to a trial within 120 days of arrival in the receiving jurisdiction. N.J.S.A. 2A:159A-4(c). However, Article VI provides that when "determining the duration and expiration dates of the time periods provided in Article [] IV of this Agreement, the running of said time period shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." N.J.S.A. 2A:159A-6(a).
Here, defendant was not tried within 120 days due to delays caused by substitutions of defense counsel. The issue is whether the judge erred when he ruled that the time period was tolled because defendant was "unable to stand trial" within the meaning of N.J.S.A. 2A:159A-6(a). Defendant argues that he was ready and able to stand trial, and that "but for" the State's belated production of witnesses, substitutions of counsel would not have been required, and the trial would not have been delayed. Defendant contends that despite the State's claim that it was "ready for trial", its insistence on using Eichman and Gist crippled the defense and pushed the time period beyond 120 days. Thus, it *104 was ultimately the State's actions which impaired defendant's ability to stand trial within the IAD period. Since neither witness was used at trial, defendant contends that he suffered legal and custodial "limbo" for over a year for no good reason. He claims that the State's conduct constituted flagrant abuse, requiring dismissal of the indictments.
A prisoner is unable to stand trial if he is absent from the jurisdiction. Fuente v. State, 549 So.2d 652, 656 (Fla. 1989). Physical or mental disability also renders a defendant unable to stand trial. Stroble v. Anderson, 587 F.2d 830, 838 (6th Cir.1978), cert. denied, 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). A number of courts have held that a prisoner is unable to stand trial during periods of delay occasioned by the defendant. United States v. Nesbitt, 852 F.2d 1502, 1516 (7th Cir.1988), cert. denied, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989); United States v. Roy, 771 F.2d 54, 59 (2d Cir.1985), cert. denied, 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986); State v. Bernson, 106 Or. App. 252, 807 P.2d 309, 310-11, rev. denied, 311 Or. 433, 812 P.2d 828 (1991).
The question of what constitutes inability to stand trial, within the meaning of N.J.S.A. 2A:159A-6(a), has not been extensively addressed in New Jersey case law. Our Supreme Court did consider a similar issue in State v. Lippolis, 55 N.J. 354, 262 A.2d 203 (1970), rev'g on dissent, 107 N.J. Super. 137, 257 A.2d 705 (App.Div. 1969). Defendant in Lippolis made a request for final disposition of the charges pending in New Jersey under Article III of the IAD, which provides that a prisoner must be brought to trial within 180 days of his request for a final disposition of the case. Lippolis, supra, 107 N.J. Super. at 140, 257 A.2d 705. After filing the proper forms, the prosecutor was informed that defendant was unavailable due to a pending hearing in Pennsylvania. The prosecutor took no further action to take custody of defendant until after the 180-day period had expired. This court, dividing 2-1, upheld dismissal of the indictment under these facts, noting that *105 the prosecutor was at fault for failing to make a timely inquiry into the availability of defendant. Id. at 141-47, 257 A.2d 705.
The Supreme Court reversed, relying on the rationale of the dissenting judge in Lippolis, Judge Kolovsky, who held that the public interest was not served by so draconian a remedy. In his dissent, Judge Kolovsky reasoned:
In the absence of more specific guidelines in the statute, the question of whether good cause exists for a continuance must be resolved from a consideration of the totality of circumstances in the particular case, on the background of the considerations which motivated the interstate agreement, as expressed in N.J.S.A. 2A:159A-1.
Of particular significance is the fact that nothing which the prosecutor did or failed to do was indicative of an intent not to prosecute the indictment....
I am of the opinion that in such circumstances the statutory power of the court to grant a necessary and reasonable continuance for good cause is available .. . where ... the resultant delay is short and there is no showing that defendant ... had been prejudiced thereby.
[Id. at 148-49, 257 A.2d 705.]
Here, defendant was brought to New Jersey on January 14, 1988, and jury selection commenced in March 1990. This was not a short delay. However, the focus of the inquiry under Lippolis is the conduct and intent of the prosecutor: did the prosecutor cause the delay due to an error or misunderstanding, or by his inaction, or did he otherwise evince an intention not to diligently pursue the case? Id. at 148-49, 257 A.2d 705. The consequences of official misunderstandings, or administrative errors and negligence, should not be visited on the prisoner who is blameless. State v. Mason, 90 N.J. Super. 464, 470, 218 A.2d 158 (App.Div. 1966).
Under the circumstances here, the State cannot be faulted for the long delay. For example, the first delay occurred after 63 days had expired, when the time period was tolled by mutual agreement. This period lasted from March 1988 to January 1989, nearly ten months. Following this delay by mutual agreement, two sets of defense attorneys withdrew because of conflicts of interest involving State witnesses.
*106 The first set of defense attorneys were granted leave to appeal the denial of their motion to withdraw, further contributing to the delay. See Dillon v. State, 844 S.W.2d 139, 142-43 (Tenn. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1589, 123 L.Ed.2d 155 (1993) (where defendant is unable to stand trial within meaning of IAD during time consumed by pre-trial motions and defense appeals from motions, these periods of delay are occasioned by defendant). The fact that jury selection was already underway when the first pair of attorneys withdrew is strong evidence that the State acted diligently in bringing the case to trial within the required time period. Defendant's second pair of attorneys understandably requested a continuance to prepare, which unavoidably exacerbated the delay.
On September 15, 1989, defendant's third and final pair of attorneys was appointed. After numerous hearings and the resolution of pre-trial motions, trial commenced in March 1990, about 180 days after this last appointment. The trial judge did not err in ruling that, under a reasonable construction of N.J.S.A. 2A:159A-6(a), defendant was unable to stand trial while he was between attorneys, while new attorneys prepared a defense, and while various pre-trial motions and interlocutory appeals were pending before the trial judge and this court.
In State v. Johnson, 188 N.J. Super. 416, 457 A.2d 1175 (App. Div. 1982), certif. denied, 93 N.J. 282, 460 A.2d 681 (1983), defendant similarly argued that his indictment should have been dismissed pursuant to the IAD because the judge acted unreasonably in extending the time for trial beyond 120 days. Id. at 421, 457 A.2d 1175. The extension was necessitated, among other reasons, by defendant's lack of legal representation. Id. at 419, 457 A.2d 1175. We ultimately affirmed defendant's conviction, stating:
We see no frustration of the purpose of the Interstate Agreement in this case.... When the judge in Hudson County extended the time for trial in that county he acted in recognition of the fact that defendant faced a murder trial in Warren County. Further, it was necessary to assign counsel to represent defendant in Hudson County. Certainly there is nothing in the record to indicate that the prosecutor was dilatory or did not intend to prosecute defendant.
[Id. at 422, 457 A.2d 1175.]
*107 The concern that prosecutors will needlessly delay trial unless properly motivated impels the IAD requirement that trial commence within a reasonable and fixed period of time. Here, as in State v. Johnson, supra, circumstances prevented the start of trial, and, as noted, there was no indication that the prosecutor was dilatory. There also is no showing that defendant was prejudiced by the delay, either through unavailable witnesses or through lost evidence.
Alternatively, as pointed out by the State, the IAD permits the court to grant "any necessary and reasonable continuances," "for good cause shown in open court, the prisoner or his counsel being present" at any time prior to an actual entry of an order dismissing the indictment. N.J.S.A. 2A:159A-3(a). Here, trial scheduling was done in open court with defense counsel present and lodging no objections to the timetable set by the judge. Continuances were requested and granted by defendant's first and second team of attorneys. Thus, the 120-day time period may also be considered expanded based on the court's grant of necessary continuances to defendant, pursuant to N.J.S.A. 2A:159A-4(c), to allow counsel time to prepare for trial.
As defendant stresses, the two witnesses who were responsible for the attorney withdrawals ultimately did not testify at trial. However, there is no evidence in the record that the prosecutor's motive in identifying and naming these witnesses was to delay trial or "cripple the defense." The defendant does not allege, for example, that the State was aware that Eichman and Gist would present conflicts of interest necessitating attorney withdrawals. Moreover, under R. 3:13-3(f), the State was under a continuing obligation to provide defendant with the names of its witnesses, up to the time of trial. Thus, identifying Gist and Eichman as potential witnesses, even at a late date, was within the spirit of our rules of criminal procedure.
*108 Defendant cites to a number of out-of-state cases for the proposition that the State's own delaying tactics will not toll the 120-day IAD requirement. These cases are not persuasive because the record here does not support defendant's contention that the State acted deliberately to delay this trial.
In view of the need for a retrial, we need not reach the balance of defendant's points on appeal.
Reversed.
NOTES
[1] This was the jury verdict form, as answered.
 JURY VERDICT FORM
 (Guilt Phase of Trial Only)
 State of New Jersey v. Frank M. Millett
 Indictment XX-XX-XXXXD
 Count One  Omit
 Count Two  Robbery
 (in the course of committing
 a theft did inflict
 bodily injury or used
 force upon Anthony Mazzo.)
 Not Guilty ____ Guilty X 
 Only if you find the defendant
 guilty on this
 robbery charge should
 you determine whether
 defendant was armed or
 not armed in the commission
 of the robbery.
 Armed X Not Armed ____
 Count Three  (Felony) Murder
 (in the course of committing
 a robbery, defendant
 caused the death of Anthony
 Mazzo)
 Not Guilty ____ Guilty ____
 Count Four  Murder
 A.[*] (by his own conduct
 defendant did purposely
 or knowingly cause the
 death of Anthony Mazzo
 (meant or intended to
 cause death).)
 Not Guilty X Guilty ____
 or
 B. (by his own conduct
 defendant did purposely
 or knowingly cause serious
 bodily injury that resulted
 in the death of Anthony
 Mazzo (mean or intended
 to cause serious
 bodily injury  not
 death).)
 Not Guilty ____ Guilty X 
 Only if you find defendant
 not guilty of both A
 and B above should you
 go on to consider "C" 
 Aggravated Manslaughter,
 below.
 C. Aggravated Manslaughter
 (recklessly caused the
 death of Anthony Mazzo
 under circumstances
 manifesting extreme indifference
 to human life.)
 Not Guilty ____ Guilty ____
 Only if you find defendant
 not guilty of A, B, or
 C above should you consider
 "D", Reckless Manslaughter
 or "E" Manslaughter, below.
 D. Reckless Manslaughter
 (recklessly caused
 death of Anthony Mazzo)
 Not Guilty ____ Guilty ____
 or
 E. Manslaughter
 (purposeful, or knowing
 murder which was committed
 in the heat of passion,
 resulting from a
 reasonable provocation).
 Not Guilty ____ Guilty ____

[*] If guilty is the verdict in Count Four (A), the death penalty is a possible result in the penalty phase of this trial. A guilty verdict in Count Three, or Count Four (B), (C), (D), or (E) cannot result in the death penalty being imposed. In such event the Court will determine the sentence, which will be for a term of years, not the jury.